THE JERSEY CITY CHAPTER OF THE PROPERTY OWNER'S
PROTECTIVE ASSOCIATION, *ETC.*, *ET AL.*, PLAINTIFFS-
RESPONDENTS, v. CITY COUNCIL OF JERSEY CITY, *ET
AL.*, DEFENDANTS-APPELLANTS.

Argued October 6, 1969—Decided December 15, 1969.

Mr. *Samuel Lanzet,* Assistant Corporation Counsel, argued the cause for appellants (Mr. *James F. Ryan,* Corporation Counsel of the City of Jersey City, attorney).

Mr. *Richard E. Friedman* argued the cause for respondents (Messrs. *Friedman, Grundman & Friedman,* attorneys).

The opinion of the court was delivered by

JACOBS, J.   The plaintiffs filed a complaint in lieu of prerogative writ attacking resolutions of the Planning Board and the Municipal Council of Jersey City which determined that a specified area within the City constituted a blighted or renewal area within the contemplation of *N. J. S. A.* 40:55–21.1. There were cross motions for summary judgment and the Law Division granted the plaintiffs' motion. The defendants appealed and we certified while the matter was awaiting argument in the Appellate Division. *R.* 2:12–2.

The specified area consists of space above the railroad tracks of the Penn Central Transportation Co. near Jersey City's Journal Square on the west side of Kennedy Boulevard.

The tracks run in an east-west direction beneath the boulevard. The space commences 23 feet above the ground and the railroad, which requires no more than 23 feet for its operations, has indicated its readiness to sell it. The land beneath is depressed 40 feet below street level and is occupied by the railroad tracks. There are no buildings in the specified area except a single commercial structure at the southwest corner which was built in 1955 and is occupied by J. M. Fields, a department store. This structure was erected in space above the railroad tracks at two levels, one below street grade and one at street grade.

The City is of course vitally concerned with the development potential of its important central business district known as Journal Square. To the north of the specified area it has already initiated a Civic Center project. To the east the Port Authority Trans-Hudson Corporation (PATH) has undertaken the construction of a 34 million dollar Journal Square Transportation Center. So far as the specified area itself is concerned, the City hopes to construct a municipal parking facility at a level below street grade and to induce private enterprise to construct either a commercial or a housing complex or both at street grade. The City was convinced that is was in no position to develop the area without the aid of private enterprise and was equally convinced that it could not successfully induce private enterprise to participate without the benefits afforded to it by renewal acts such as *N. J. S. A.* 40:55C–40 *et seq.* Accordingly, it set in motion the various statutory procedures which culminated in the resolution now under attack.

The first formal step taken by the Municipal Council was the adoption of an appropriate resolution under *N. J. S. A.* 40:55–21.2. The resolution noted that, pursuant to the cited statute, the governing body of any municipality having a planning board may provide for a preliminary investigation by the planning board of any area in order to determine whether it qualifies as a blighted or renewal area under *N. J. S. A.* 40:55–21.1. It then noted that the Mayor

had requested the Council to resolve that the Planning Board conduct a preliminary investigation and make its recommendations as to whether the specified area, described with adequate particularity, was a renewal area within the provisions of the appropriate statutes. And finally it set forth that the Municipal Council resolved that a preliminary investigation be made and that the matter be referred to the Planning Board "in accordance with the provisions of *R. S.* 40:55–21.1 *et seq.*"

After its receipt of the Municipal Council's resolution, the Planning Board prepared a map showing the boundaries of the area to be investigated and the locations of the various parcels of property located therein. Copies of the map were filed in the offices of the City Clerk and the Division of Planning and were available for public inspection. A date for hearing was fixed and notice thereof was sent to all persons interested in the parcels of property and was advertised in the *Jersey Journal*, a newspaper published in the City of Jersey City. Before the hearing date, written objections were filed with the Planning Board by Mr. Richard E. Friedman, the attorney for the plaintiffs acting on his own behalf and on behalf of the Jersey City Property Owner's Association and its President, Mr. Abraham Kravetz. A hearing was duly held on October 17, 1968 before the Planning Board and was attended by various persons including the attorney who had filed the written objections.

At the hearing Mr. Alan Canter, Director of Jersey City's Division of Planning, described in detail the area in question, noted that it had been under study by the Division for some time, and reported on affirmative findings of the Division as to whether the area was a blighted or renewal area within the contemplation of *N. J. S. A.* 40:55–21.1. He pointed out that the terms "blighted area" and "renewal area" may be used interchangeably (*N. J. S. A.* 1:1–2b) and that it is legally sufficient if any one of the enumerated criteria in the statute is satisfied. *See Wilson v. City of Long Branch,* 27 *N. J.* 360, 392, *cert. denied,* 358 *U. S.*

873, 79 *S. Ct.* 113, 3 *L. Ed. 2d* 104 (1958). He referred primarily to the criteria set forth in paragraphs (c) and (e) of *N. J. S. A.* 40:55–21.1 which read as follows:

(c) Unimproved vacant land, which has remained so for a period of ten years prior to the determination hereinafter referred to, and which land by reason of its location, or remoteness from developed sections or portions of such municipality, or lack of means of access to such other parts thereof, or topography, or nature of the soil, is not likely to be developed through the instrumentality of private capital;

\*     \*     \*     \*     \*     \*     \*     \*

(e) A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.

Mr. Canter stressed the obvious fact that the very presence of the railroad cut at Journal Square was in itself a blighting influence which had through the years substantially precluded the proper development of the area. He noted that the Division's concern was not with so-called air rights or airspace generally but only with the question of whether the designated space "above certain parcels of land now in railroad use" properly qualified as blighted land or as renewal area within the statutory contemplation. He cited *N. J. S. A.* 46:3–19 which explicitly provides that estates, rights and interests in areas above the ground may be validly created in persons other than the owners of the ground and "shall be deemed to be estates, rights and interests in lands." And addressing himself directly to the statutory verbiage in paragraphs (c) and (e) of *N. J. S. A.* 40:55–21.1 he noted that "[t]his land has stood in its vacant and unimproved state for a time in memoria", that because of its location, topography, lack of access, etc. it is not likely to be developed through the "instrumentality of private capital" and that lack of proper utilization of the area because of the attendant "conditions" is resulting in a stagnant and unproductive con-

dition of land potentially useful and valuable for "contributing to and serving the public health, safety and welfare."

Mr. Canter submitted excerpts from pertinent study reports including a 1966 report prepared for the Jersey City Redevelopment Agency by Larry Smith & Company of New York. That report specifically noted that the railroad tracks forty feet below ground level and the land surrounding the tracks owned by the railroad form a bowl and "[t]his bowl section of approximately eight acres has a blighting effect on the Journal Square area due to the fact that with the exception of the tracks used by the PATH, the land has remained undeveloped." It then went on to point out that although the Journal Square area had the highest valued property in Jersey City, with excellent transportation facilities and a densely populated trading area, it had not been developed to its commercial potential and that "[p]resent and proposed urban renewal action is directed towards strengthening Journal Square." After Mr. Canter's presentation, supporting statements in favor of blighting the specified area were made by Fred Babcock, President of Frederick M. Babcock and Company of Washington, D. C., a firm that engages primarily in real estate consultation and evaluation work, Mr. Bernard Alicks, Executive Director of the Jersey City Area Development Council, and Mr. Alvin E. Gershen, a licensed professional planner and engineer and consultant to the City of Jersey City.

Mr. Babcock had conducted a study for the Division of Planning and had submitted a report in 1968. He expressed the view that the area was blighted and should be redeveloped as such; he pointed out that his view was not at all impaired by the fact that the railroad use itself was a proper one and would be continued and he referred to instances throughout the country where it was necessary to wipe out "this sort of a condition in the middle of a strong retail and commercial business center in a big city" by appropriate use of the space above the railroad tracks. Mr. Babcock considered it highly unlikely that a private entrepreneur could deal with the

matter without public support or participation; this conformed with Mr. Canter's expressed opinion that "because of the prevalence of environmental deficiencies, the development of the parcel through the instrumentality of private capital alone will continue to be uneconomical."

Mr. Alicks spoke for the Area Development Council, an arm of the Jersey City Chamber of Commerce. As he saw it, the issue was a narrow one which he put in the following terms: "Does the existence of this scarred and unused acreage which makes up the area commonly referred to as 'the cut' in the city's most heavily traveled retail district, constitute a blighting influence?" He reported that the officials of the Area Development Council unanimously considered the area blighted and he concluded with the comment that the land "had lain fallow for more than three-quarters of a century and this blighted condition certainly will not lessen as new conditions appear."

Mr. Gershen stated that as consultant to the City of Jersey City he had been involved in Journal Square on studies and urban renewal for approximately four or five years. He noted that there had been negotiations on the City's behalf with various private enterprise firms and that the conclusion had been reached "that it is only possible to develop Journal Square in this area not by private enterprise acting alone, but private enterprise acting jointly with government to further the resources and the general welfare of the City of Jersey City, its citizens and taxpayers." He pointed out that the space above the railroad cut was not being used to its potential and he referred to areas elsewhere including New York City where space above railroad tracks was being used very effectively. He referred to the statutory criteria of blight and recommended that the specified area be declared blighted within those criteria. Stressing the "potentially" useful and valuable nature of the specified area within *N. J. S. A.* 40:55–21.1, particularly in the light of the nearby Civic Center and Transportation Center projects, he concluded his remarks with the assertion that, once the area is

declared blighted, a specific set of programs can be submitted "which we can then demonstrate and show will be for the best interest of the citizens of the City of Jersey City, for the general welfare of the citizens of Jersey City and can move forward with the very important program of developing this city consistent with its geographical location taking advantage of existing federal, state and local programs, but being built by private enterprise."

No one interested in any of the parcels included in the specified area spoke in opposition to a declaration of blight but Mr. Friedman, along with Mr. Allan Bardock, did so. Mr. Friedman appeared as a taxpayer and on behalf of a taxpayer's group. He acknowledged that he did not like the railroad tracks there and "might prefer to see a nice shopping complex" but he expressed the view that the specified area was not a blighted one within the terms of the statute. He expressed the further view, without however any supporting data or material, that in the near future "private enterprise and capital is going to come in" without any public support. Mr. Bardock is a Jersey City real estate broker and President of the Jersey City Real Estate Board. He said that he was for commercial development and acknowledged the "great potential there" but he questioned whether blighting was the best approach. He concluded with the caution that the members of the Planning Board should make sure "that this is the best way you are proceeding" rather than through private development alone without taxpayer participation.

After the hearing was completed and the premises were inspected by all members of the Planning Board, a resolution determining that the specified area was a blighted or renewal area within *N. J. S. A.* 40:55-21.1 was adopted, along with a report recommending to the Municipal Council that the determination be approved pursuant to *N. J. S. A.* 40:55-21.7. The resolution set forth that the specified space more than 23 feet above the railroad tracks is not being used or necessary for railroad purposes; that it has all the legal attributes of land by virtue of *N. J. S. A.* 46:3-19 to 22 in-

clusive; that it has remained in its present stage for more than 10 years and by reason of its location, etc., "is not likely to be developed through the instrumentality of private capital"; and that "[b]y reason of the foregoing there has been a total lack of proper utilization of the said area resulting in a stagnant and unproductive condition of the said area, which is potentially useful and valuable for contributing to and serving the public health, safety and welfare." After its receipt of the Planning Board's resolution and report, the Municipal Council of Jersey City adopted a resolution approving the Planning Board's determination that the specified area is a blighted or renewal area within *N. J. S. A.* 40:55-21.1.

Following the adoption of the Municipal Council's resolution the plaintiffs filed their complaint. The defendants then served notice of motion for summary judgment. Attached to the notice were affidavits and exhibits including a transcript of the hearing before the Planning Board. A cross motion for summary judgment was filed by the plaintiffs with a statement that reliance would be placed on the affidavits theretofore filed along with the legal briefs. The only affidavits theretofore filed were those on the defendants' behalf, apart from an affidavit of Mr. Friedman which was attached to the complaint and which contained no material facts at variance with the matters set forth in this opinion. After due consideration, the Law Division granted the plaintiffs' motion for reasons expressed in an oral opinion embodied in the Appendix submitted to this Court.

The Law Division first properly disposed of a preliminary issue raised with respect to the standing of the plaintiffs to attack the declaration of blight. It held that the plaintiffs had such standing (*N. J. S. A.* 40:55-21.4 to 21.6 inclusive; cf. *Al Walker, Inc. v. Borough of Stanhope,* 23 *N. J.* 657, 661 (1957)) and this holding is not questioned before us. It then dealt with *N. J. S. A.* 46:3-19 to 22 inclusive and construed them as applicable only where the estate in space above the surface of the ground has been "validly created" in accordance

with the statutory provisions. It concluded that since the underlying land was being used usefully for railroad purposes and since no separate legal estate in the space above had been created, the broad references to land in paragraphs (c) and (e) of *N. J. S. A.* 40:55–21.1 were to be deemed inapplicable here (*but cf. McEwan v. Pennsylvania, N. J. & N. Y. Railroad Co., 72 N. J. L.* 419, 420–421 (*Sup. Ct.* 1905)); it also concluded that paragraph (e) could be viewed as inapplicable on the further ground that under the *ejusdem generis* rule of construction (*see Edwards v. Mayor, etc., of Borough of Moonachie, 3 N. J.* 17, 23 (1949); *cf. 2 Sutherland, Statutory Construction* § 4912 (*3d ed.* 1943)) the phrase "other conditions" therein is limited to conditions similar to those specified earlier, namely "conditions of the title" and "diverse ownership of the real property therein."

██ The Law Division concluded its oral opinion with the comment that "the intended action of the Planning Board and Municipal Government is to be commended in trying to utilize all necessary ways and means to make progress in urban renewal"; however, it reiterated its view that *N. J. S. A.* 40:55–21.1 was not comprehensive enough to be legally enabling here and that further legislative authority would be required. Following this suggestion, a bill (S-784) was introduced in the 1969 Legislature to amend *N. J. S. A.* 40:55–21.1 so as to refer specifically to space above railways, highways, etc. The bill never emerged from committee and its introduction has no significant bearing on the matter of statutory construction now before us. *See Schmoll v. Creecy, 54 N. J.* 194, 203 (1969); *Fraser v. Robin Dee Day Camp, 44 N. J.* 480, 486 (1965); *Breen v. Peck, 28 N. J.* 351, 365 (1958). Indeed, even if the bill had passed it would not dictate a narrower judicial construction of the original legislation for, as Justice Proctor pointed out in *J. R. Christ Constr. Co. v. Willete Assocs., 47 N. J.* 473, 480 (1966), the legislators might well "have thought the amendment would merely clarify and make more specific a right which already existed." *Cf. Pub. L. No.* 88–560, § 308(a)(1), *amending*

the Federal Housing Act of 1949 (42 *U. S. C. A.* § 1460(c) (1)(iv); *L.* 1963, *c.* 6, *amending L.* 1960, *c.* 148 (*N. J. S. A.* 27:12–7).

The plaintiffs contend that the official determination to the effect that the airspace more than 23 feet above the tracks was blighted "is a conceptual, logical and perceptual absurdity, neither envisioned nor intended by the reasonable and sophisticated legislative mind." Their thesis is that the applicable statute was directed at "perceptible conditions of offensive blight and decay" and they stress the fact that the statute specifically refers to land but contains no specific reference to space above land. While we agree that the goal is fairly to ascertain the legislative contemplation we flatly reject any notion on the plaintiffs' part that the statute concerns itself solely with the removal of "perceptually offensive" slums; and we also reject any notion on their part that the Legislature's specific reference to land without specific reference to space above the land evinces a legislative intent to exclude blighting of the space. Needless to say, there is nothing either conceptually or logically inappropriate in foresighted legislation which either expressly or impliedly permits space above railroad tracks, highways and the like, to be dealt with separately as blighted or renewal areas for modern redevelopment purposes. *See* Crawford, "Some Legal Aspects of Air Rights and Land Use," 25 *Fed Bar. J.* 167 (1965); Gormley, "Urban Redevelopment to Further Aesthetic Considerations: The Changing Constitutional Concepts of Police Power and Eminent Domain," 41 *North Dakota L. Rev.* 316 (1965); Bernard, "Airspace in Urban Development," 46 *Technical Bulletin, Urban Land Institute* 7 (1963); *see also* Note, "Conveyance and Taxation of Air Rights," 64 *Colum. L. Rev.* 338, 340–42 (1964); Note, "Leasing Air Space Above Public Buildings — The Public Use Doctrine and Other Problems," 28 *U. Pitt L. Rev.* 661 (1967).

The Blighted Area Act (*N. J. S. A.* 40:55–21.1 *et seq.*) and the related Redevelopment Agencies Law (*N. J. S. A*

40:55C–1 *et seq.*) contain similar definitions as to blighted areas; they go far beyond the "perceptually offensive" slums envisioned by the plaintiffs. Similarly the declaration of policy in the Redevelopment Agencies Law (*N. J. S. A.* 40:55C–2) evidences the much greater breadth of the legislative contemplation; thus there is reference to areas in the process of becoming blighted "by reason of inadequate planning" or "excessive land coverage" or "deleterious land use" or "unsound subdivision plotting" or "obsolete layout," etc.; the public purpose is to acquire, replan, hold, redevelop or dispose of such areas "in such manner that they shall become available for economically and socially sound development by private or public enterprise or by a combination of both"; and to insure liberal rather than narrow judicial construction, there is an express provision that the powers enumerated in the statute "shall be interpreted broadly to effectuate the purposes thereof." *N. J. S. A.* 40:55C–29.

Neither paragraph (c) nor paragraph (e) of *N. J. S. A.* 40:55–21.1 speaks in terms of perceptually offensive slums. Paragraph (c) deals with unimproved vacant land which, because of its location, etc., is not likely to be developed through the instrumentality of private capital; and paragraph (e) deals with areas which, because of title difficulties or other conditions, are not being properly utilized with resulting unproductiveness of potentially useful land. The decisions rejecting various constitutional attacks on urban renewal legislation have clearly recognized that it goes far beyond the elimination of the perceptually offensive slums. *See Wilson v. City of Long Branch, supra,* 27 *N. J.* 360; *Cannata v. City of New York,* 11 *N. Y. 2d* 210, 227 *N. Y. S. 2d* 903, 182 *N. E. 2d* 395 (1962); *Rhyne, Municipal Law* 520 (1957). In *Cannata* an attack was made on New York legislation authorizing the redevelopment of predominantly vacant areas which were impairing community growth. Some homeowners in an area proposed for such redevelopment contended that there was no "tangible physical blight" so as to constitute their area a slum and that the taking of

their nonslum land for the creation of an industrial park would be unconstitutional. Their contention was summarily rejected in an opinion which stated that "an area does not have to be a 'slum' to make its redevelopment a public use nor is public use negated by a plan to turn a predominantly vacant, poorly developed and organized area into a site for new industrial buildings." 227 *N. Y. S. 2d,* at 905–906.

It is true, as the plaintiffs stress, that paragraphs (c) and (e) refer to "land" without specific mention of the space above, although it is worthy of note that (e) and other pertinent statutory clauses also refer to "areas". *See N. J. S. A.* 40:55–21.1; *N. J. S. A.* 1:1–2b. The word "land" itself may have different meanings depending on its context. *See McEwan v. Pennsylvania, N. J. & N. Y. Railroad Co., supra,* 72 *N. J. L.* 419, 421; Ball, "The Jural Nature of Land," 23 *Ill. L. Rev.* 45, 47 (1928). In *Philadelphia Trust etc. v. Borough of Merchantville,* 74 *N. J. Eq.* 330, 332 (1908) the court pointed out that "[t]he word 'land' is comprehensive in its import, and includes many things besides the earth we tread * * *." In law, it generally includes the space above, as well as the subsurface, at least to its usable extent. *See Toth v. Bigelow,* 1 *N. J.* 399, 404 (1949); *cf. United States v. Causby,* 328 *U. S.* 256, 66 *S. Ct.* 1062, 90 *L. Ed.* 1206 (1946); Ball, "Division Into Horizontal Strata of the Landspace Above the Surface," 39 *Yale L. J.* 616 (1930). *See also* Ball, *supra,* 23 *Ill. L. Rev.,* at 67: "A piece of land, as a thing in law, must be defined by ascription to three-dimensional space."

Since the early thirties there have been many instances in which the space above railroad tracks has been separately conveyed for highly productive development. *See* Ball, *supra,* 39 *Yale L. J.,* at 651; 46 *Technical Bulletin, supra,* at 9. The conveyed space has been generally viewed as real property. *See* 64 *Colum.L.Rev., supra,* at 338: "The air itself is not real property and is not conveyed; airspace, however, is real property when described in three dimensions with reference to a specific locus." *N. J. S. A.* 40:55C–

5(k) defines real property, for purposes of the Redevelopment Agencies Law, to mean land and any estate, interest and right therein. *See also N. J. S. A.* 1:1–2. When in 1938 the Legislature expressly recognized that separate interests in the space above land may be validly created, it appropriately declared that such separate interests shall be deemed to be "interests in land." *L.* 1938, *c.* 370—now *N. J. S. A.* 46:3–19 to 22 inclusive. *Cf. Newhoff v. Mayo,* 48 *N. J. Eq.* 619, 624 (*E. & A.* 1891). Surely, in the light of all of the above, it cannot fairly be said that when the Legislature used the general term "land" without more, it evinced the short-sighted purpose of excluding the space above railroad tracks and the like as a proper subject of a blight or renewal determination. *Cf. Crawford, supra,* 25 *Fed.Bar.J.,* at 175:

> Those who have responsibility to plan for our ever-increasing congested urban areas may, it is submitted, regard land in a multi-dimensional aspect so that they may forecast construction of both public and private improvements and facilities, having in mind either the immediate development of otherwise unused air space, or its ultimate future development. In this way our land and air space can be used to the greatest advantage, and unnecessary waste can be eliminated.

Although *N. J. S. A.* 40:55–21.10 has been cited to us, it in nowise supports the plaintiffs' position here. It provides that the power of eminent domain, granted to the municipality by the Blighted Area Act, shall not be exercised to acquire any property or interests in property "owned or used by any public utility in furnishing any commodity or service which by law it is authorized to furnish." Since the railroad has indicated its readiness to sell the specified area, the governing body will presumably have no reason for seeking to invoke the power of eminent domain. We need not here determine whether the specified area, which admittedly is not used or needed in the operation of the railroad, would fall within the statutory orbit of property owned or used "in furnishing" a railway service. In any event, nothing in the official determination that the specified area constituted a

blighted or renewal area within the statute was intended or could be construed to interfere with the continued operation of the railroad as contemplated by *N. J. S. A.* 40:55–21.10 and, similarly, nothing in that section could rationally be construed as negating a legislative grant of power to make the determination.

When all is said and done, the matter of statutory construction here will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation. *See City of Clifton v. Zweir,* 36 *N. J.* 309, 322–323 (1962); *State v. Gill,* 47 *N. J.* 441, 445 (1966); *cf. Lloyd v. Vermeulen,* 22 *N. J.* 200, 204–206 (1956); *Alexander v. N. J. Power & Light Co.,* 21 *N. J.* 373, 379 (1956). It is true that the legislation contains no specific reference to airspace as such; but in view of its sweeping social objectives it is inconceivable that there was ever any purpose or intent to exclude airspace above railroad tracks and the like from the legislative grant of power. We assume that the subject was never brought up or that, if it was brought up, the conclusion was reached that the statutory terms were sufficiently comprehensive in nature to include airspace above railroad tracks and the like. In either event, the legislation should now fairly be construed as embodying authority for the official action taken here. *See Dvorkin v. Dover Tp.,* 29 *N. J.* 303, 313–315 (1959); *Safeway Trails, Inc. v. Furman,* 41 *N. J.* 467, 477 (1964); *cf. State v. Provenzano,* 34 *N. J.* 318, 322 (1961); *New Capitol Bar & Grill Corp. v. Div. of Employment Sec.,* 25 *N. J.* 155, 160 (1957); *see also* 2 *Sutherland, supra* § 5102.

*Dvorkin v. Dover Tp., supra,* 29 *N. J.* 303, considered legislation which expressly covered cases where the purchaser of a tax certificate had paid less than the amount which the owner of the property would have to pay to redeem but did not purport to cover cases where the purchaser had paid more than that amount. The Legislature had either

not thought of the latter situation or had thought that no express treatment of it was required (29 *N. J.*, at 313). In either event, the matter became one of judicial construction and this Court adopted an interpretation consonant with the probable intent of the draftsman "had he anticipated the situation at hand." 29 *N. J.*, at 315. In *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561, 566 (1962), we broadly construed a will so as to carry out the testator's probable intent had he "envisioned the present inquiry"; in the course of our opinion we pointed out that in construing legislation "our courts will with equal breadth search for the probable legislative intent and endeavor to find a reasonable meaning in keeping with the legislative goal." 36 *N. J.*, at 567–568.

In *Safeway Trails, Inc. v. Furman, supra,* 41 *N. J.* 467, the question raised was whether a statutory excise tax imposed on buses operating on New Jersey's highways was applicable to toll roads such as the New Jersey Turnpike and the Garden State Parkway. The question was answered in the affirmative by this Court which readily construed the tax as applicable to toll roads though, in the language of the opinion, they were certainly not within the "specific contemplation" of the legislators when they enacted the statute. 41 *N. J.*, at 477; *see* 2 *Sutherland, supra* § 5102, at 509–10:

> Standards established by the medium of legislation are usually intended to have considerable breadth with the result that a statute may cover many situations that do not immediately occur to the mind. And so it is a general rule of statutory construction that a statute, expressed in general terms and words of present or future tense, will be applied, not only to situations existing and known at the time of enactment, but also prospectively to things and conditions that come into existence thereafter. Legislation must be given elastic operation if it is to cope with changing economic and social conditions.

The plaintiffs contend that even assuming, as we now hold, that there was sufficient legislative authority to declare the specified area to be a blighted or renewal area within the statutory contemplation, they are still entitled to a "plenary

trial". We reject this contention for the matter was properly presented to the Law Division on cross motions for summary judgment and, on the record before it which contained no material factual disputes, summary judgment should have been granted in favor of the defendants. *R.* 4:46. As was pointed out in *Lyons v. City of Camden,* 48 *N. J.* 524 (1967), the official determination came to the Law Division "accompanied by a presumption of validity" and the burden was on the attackers "to demonstrate lack of the required substantial evidence support." 48 *N. J.,* at 533. There was no such demonstration but, on the contrary, the defendants made an adequate showing of substantial evidence as set forth earlier in this opinion. It is significant that the plaintiffs did not tender any evidence before either the Planning Board or the Law Division to rebut the defendants' showing (*cf. Lyons v. City of Camden, supra,* 48 *N. J.,* at 533–534); they did at one point during the Planning Board hearing suggest that private enterprise might come in without public support but, in the light of the history, the circumstances and the findings, that may properly be viewed as nothing more than a forlorn hope.

■ The plaintiffs' final contention is that the official determination violated "the statutory requirement that a reasonably substantial area be blighted." There is no explicit statutory requirement to that effect although this Court has recognized that the legislative purpose was "to deal with substantial areas as distinguished from individual properties * * *." *Wilson v. City of Long Branch, supra,* 27 *N. J.,* at 378. The specified area is a distinctive one and in view of its size and location is clearly ·a substantial one within the meaning of the *Wilson* case; in any event we find no reason here for concerning ourselves with the precise fixation of the boundaries by the local officials. *See Carroll v. City of Camden,* 34 *N. J.* 575, 577 (1961); *Berman v. Parker,* 348 *U. S.* 26, 35–36, 75 *S. Ct.* 98, 99 *L. Ed.* 27, 39 (1954):

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and

character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

The judgment appealed from is Reversed with direction that judgment be entered in favor of the defendants. No costs.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.