913 A.2d 842 (2007)
389 N.J. Super. 510
In the Matter of Jacob MICHELETTI (a minor) Dependent of the Adult Insured, Joseph Micheletti, Petitioner-Appellant,
v.
STATE HEALTH BENEFITS COMMISSION, Respondent-Respondent.
No. A-4418-05T2
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 2006.
Decided January 17, 2007.
*844 Joseph M. Micheletti, appellant pro se.
Anne Milgram, Acting Attorney General, for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Jeff Ignatowitz, Deputy Attorney General, on the brief).
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
COLLESTER, J.A.D.
The appeal by Joseph Micheletti (petitioner) on behalf of his son Jacob ("Jake") raises the issue as to whether coverage for medically necessary treatment may be declined to an autistic child as a dependent under the State Health Benefits Program (Program).
The Program was created by the State Health Benefits Program Act of 1961, N.J.S.A. 52:14-17.25 to .45 (Act), which also spawned the State Health Benefits Commission (SHBC). The SHBC was entrusted to establish the Program by negotiating and purchasing medical, surgical, hospital, and major medical benefits for participating public employees and their families, "in the best interests of the State and its employees" as well as exclusive jurisdiction to determine disputed matters under the plan. N.J.S.A. 52:14-17.27 to .28.
In addition to basic benefits and stated major medical expense benefits, the Act granted the SHBC sole authority to determine what other "eligible medical services" should be included within the Program as well as "those which shall be excluded from or limited under such coverage." N.J.S.A. 52:14-17.29(A)(2). This discretion to limit or exclude coverage is to be exercised by the SHBC as it deems "necessary or desirable to avoid inequity, unnecessary utilization . . . or benefits otherwise available" under Medicare or other federal statutes, and "[n]o benefits shall be provided beyond those stipulated in the contracts held by the [SHBC]." N.J.S.A. 52:14-17.29(B).
The Act further gave the SHBC the authority to establish rules and regulations, and dependents enrolled in the program are "subject to such regulations and conditions as the [SHBC] and the carrier may prescribe." N.J.S.A. 52:14-17.30(B). The SHBC used its rule making power to *845 issue a regulation which provided dependents or those enrolled in the Program with benefits subject only to the terms specified in the relevant insurance contracts.
The [SHBC] adopts by reference all the policy provisions contained in the contracts between the health and dental plans and the [SHBC] as well as any subsequent amendments thereto, to the exclusion of all other possible coverages.
[N.J.A.C. 17:9-2.14.]
Jake was three years old when he was diagnosed with autism by a neurologist and a neurodevelopmental pediatrician. As defined by the National Institute of Child Health and Human Development (NICHD), a division of the United States Department of Health and Human Services, autism is a neurobiological development disorder that usually begins at age three and lasts a lifetime. There is no known cause and no cure. The main symptoms involve communication, both verbal and non-verbal, difficulties with social interaction, and repetitive and obsessive behaviors toward objects and routines. http://www.nichd.nih.gov/publications/pubs/ upload/autismoverview2005.pdf. See also Autism Fact Sheet, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/autism/ detail_autism.htm.
The severity of autism varies widely. Some autistic children have led functioning lives; some have obtained a college degree. But others never escaped total isolation of mind, body, and spirit. There is no definitive, separate treatment. Clinical study has demonstrated that speech therapy, physical therapy, and occupational therapy begun at an early age give the autistic child the best chance of a functioning life by minimization of symptoms, acquisition of basic skills, and development to full potential. All authorities agree that treatment should commence as early as possible. NICHD Report on Autism, supra, p. 6-7.
The sooner a child begins to get help, the more opportunity for learning . . . Early intervention programs typically include behavioral methods, early development education, communication skills, occupational and physical therapy, and structured social play.
[Id. at 7.]
Following his diagnosis, Jake was evaluated at the Hunterdon Medical Center. Speech therapy and occupational therapy were prescribed as "imperative and medically necessary to his treatment plan."
Joseph Micheletti is employed by the State of New Jersey as a Deputy Attorney General and is a member the State Health Benefits Program, having selected family coverage under New Jersey Plus (NJPLUS), a point-of-service plan offered to eligible employees and retirees. He filed a NJPLUS claim seeking pre-authorization for the prescribed speech therapy and occupational therapy from Horizon Blue Cross Blue Shield (Horizon), the administrator of the Program charged with responsibility for evaluation and processing of claims. Horizon granted authorization for speech therapy, but declined occupational therapy on grounds that the NJPLUS policy set out in the NJPLUS Members Handbook excluded coverage. The Handbook provision stated:
The plan does not cover services or supplies that are rendered with the primary purpose being to provide the person with any of the following:
 Training in the activities of daily living. This does not include services directly related to treatment of an illness or injury that resulted in a loss of a previously demonstrated *846 ability to perform those activities.
* * *
 To promote development beyond any level of function previously demonstrated.
Joseph Micheletti filed a petition from the denial of occupational therapy to the Horizon Appeals Subcommittee, which reaffirmed the denial on grounds that the occupational therapy was intended "to promote development beyond any level of function previously demonstrated by Jacob, and is therefore not covered under terms of your NJPLUS plan." A petition was then filed with the SHBC pursuant to its internal review procedure. The SHBC requested Horizon to review the entire file in the matter and report its decision.
Horizon reaffirmed its decision denying coverage for occupational therapy, and added that its prior authorization for speech therapy was erroneous, citing a provision in the NJPLUS Member Handbook stating that "speech therapy to correct pre-speech deficiencies or to improve speech skills that have not fully developed are not covered under NJPLUS." The SHBC concurred and issued its final administrative determination denying both the continuation of speech therapy and pre-authorization for occupational therapy on grounds that the therapies were sought to develop skills or improve skills that were not fully developed and were therefore excluded from coverage. This appeal followed.
In 1999, two years before Jake was born, the New Jersey Legislature enacted L. 1999, c. 106, the Mental Health Parity Law, which required health insurers and health maintenance organizations, denoted as carriers under supervision of the Department of Banking and Insurance (DOBI), to provide "coverage for biologically-based mental illness (BBMI) under the same terms and conditions as provided any other sickness under the contract." N.J.S.A. 17:48-6v. The same language is repeated in other sections of the Insurance Act Titles 17 and 17B, governing health insurance and benefits.[1] By DOBI regulation, the term "carrier" applies to "any insurer authorized to sell health insurance pursuant to Title 17B of the New Jersey Statutes; a health, hospital or medical service corporation; or a health maintenance organization." N.J.A.C. 11:4-57.2. The State Health Benefits Program is not a "carrier" and is not subject to the statutes and regulations of the DOBI.
Seven months after the Mental Health Parity Law governing health insurance carriers became law, a companion statute, L. 1999, c. 441 § 2, was enacted and codified as N.J.S.A. 52:14-17.29e, with the stated purpose of requiring that the SHBC provide the same coverage for BBMIs to persons covered under the State Health Benefits Program "as that required for other health insurers and health maintenance organizations under P.L. 1999 c. 106." (Statement to Sen. B. 2277, 208 Leg. (N.J. 1999); Statement to Assemb. B. 3588, 208 Leg. (N.J. 2000)). The statute as enacted reads as follows:
a. The State Health Benefits Commission shall ensure that every contract purchased by the commission on or after the effective date of this act that provides hospital or medical expense benefits shall provide coverage for biologically-based mental illness under the same terms and conditions as provided for any other sickness under the contract.

*847 b. Nothing in this section shall be construed to change the manner in which a carrier determines:
(1) whether a mental health care service meets the medical necessity standard as established by the carrier . . .
[N.J.S.A. 52:14-17.29e.]
The two statutes used the same language respecting coverage of BBMIs, making clear the legislative intention to provide the same coverage to persons covered under the State Health Benefits Program as required for other health insurance carriers in this State by the companion statute. The two statutes also identically define BBMI as:
[A] mental or nervous condition that is caused by a biological disorder of the brain and results in a clinically significant or psychological syndrome or pattern that substantially limits the functioning of the person with the illness including, but not limited to, schizophrenia, schizoaffective disorder, major depressive disorder, bipolar disorder, paranoia and other psychotic disorders, obsessive-compulsive disorder, panic disorder and pervasive developmental disorder or autism.
[N.J.S.A. 52:14-17.29d; N.J.S.A. 17:48-6v(a).]
Since the State Health Benefits Program is not a carrier, the SHBC, not the DOBI, has the responsibility to administer the Program. As the SHBC points out, its statutory mandate for maintenance of the largely publicly funded Program requires fiscal and administrative restraints in the allocation of limited resources, which may limit or exclude some benefits afforded under private medical health benefit plans. See Barone v. Dep't of Human Servs., 107 N.J. 355, 372-73, 526 A.2d 1055 (1987); State v. Senno, 79 N.J. 216, 229, 398 A.2d 873 (1979).
The SHBC maintains that its denial of coverage of the prescribed therapy treatment for Jake under the "non-restorative" exclusion in the Handbook is properly grounded in its authorized discretion to limit or exclude coverage "in the best interests of the State and its employees." N.J.S.A. 52:14-17.28. It asserts that the exclusion is in compliance with the clear and unambiguous statutory mandate of N.J.S.A. 52:14-17.29d and e because non-restorative treatment for conditions other than BBMIs are also excluded, and the statute requires no minimum level of care for BBMIs when not provided for any other sickness under the contract.
In general, appellate review of a final agency determination is limited. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988). We may not substitute our judgment if the agency's conclusion is supported by credible evidence, except when it is arbitrary, capricious, or unreasonable or violates legislative intent and public policy expressed or implicit in the enabling act. Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963).
As succinctly stated by our Supreme Court:
The judicial role is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

*848 [George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).]
Here there is no dispute as to Jake's diagnosis, and the State does not contest that speech therapy and occupational therapy is medically necessary for treatment of Jake's autism. What we have is the atypical and unfortunate situation of two separate State agencies reaching contrary conclusions based on different interpretations of the same language in mirror statutes. Our inquiry, therefore, is the proper interpretation of the statutory mandate, and accordingly, we are not bound by the interpretation of either agency. Mayflower Sec. Co., Inc. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973); McKenzie v. Bd. of Trs. of the Pub. Employees Ret. Sys., 389 N.J.Super. 456 at 461, 913 A.2d 810 at 813, 2006 WL 3771815, at *3, 2006 N.J.Super. Lexis 341, at *7 (App.Div.2006).
An interpretation of the same legislative language contrary to that given by the SHBC was incorporated by the DOBI in its rules and regulations adopted pursuant to the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -21. In May 2003, the DOBI proposed rules respecting benefits mandated for BBMIs under the Mental Health Parity Act, including a rule that carriers may not apply exclusions to deny or limit benefits and services, including speech and occupational therapy, that are non-restorative to persons with BBMIs. 35 N.J.R. 2158. The DOBI stated the following need for the clarification:
Relying on the first type of exclusion, the chronic condition exclusion, carriers have refused to cover speech, physical and occupational therapy for children with autism and persuasive developmental disorder even though such therapy is a key component of the treatment of such conditions. Carriers have invoked the second type of exclusion, the nonrestorative exclusion, to deny speech therapy to the same children, arguing that because these children did not previously possess the ability to speak such therapy is not required to be covered. The Department believes that the use of these exclusions to deny treatment for persons with biologically based mental disorders (BBMI) undermines the intent and purpose of the Act.
[Notice of Proposed Adoption of Regulation, 35 N.J.R. 2158.]
The proposed rules were amended for unrelated reasons and republished in May 2005. In response to an industry question as to whether carriers could refuse to cover therapy services for children who are not typically developing, the DOBI restated its position:
[T]o allow carriers to exclude the primary mode of treatment for autism and pervasive development disorder (speech, occupational and physical therapy) would render the statutory directive meaningless and, therefore, it cannot be permitted. Interpretations that render a statute void are to be avoided.
[37 N.J.R. 1524, response to comment 4.]
The rules then adopted by the DOBI included a prohibition against carriers applying an exclusion to deny benefits and services medically necessary for the treatment of BBMI, specifically listing "exclusions for physical, speech and occupational therapy that is non-restorative (that is, does not restore previously possessed function, skill or ability)." N.J.A.C. 11:4-57.3(a)(2). The rules also prohibit "exclusions for the treatment of developmental disorders or developmental delay." N.J.A.C. 11:4.57.3(a)(4).
The SHBC underscores that the DOBI rules and regulations are applicable to commercial carriers and not to the State Health Benefits Program, for which the SHBC has exclusive authority under *849 N.J.S.A. 52:14-17.29(A)(2) to set the terms of coverage for State employees except for treatments mandated by statute.[2] Accordingly, it argues that it may impose exclusions and limitations on treatment for BBMIs as long as they apply equally to other sicknesses and physical limitations. Its rationale is based on its statutory authority and the fact that it has different fiscal and administrative constraints which may require limitation or exclusion of certain benefits afforded under private medical health benefit plans. Since the State is self-insured and cannot raise premiums, any change of coverage adds costs to the Program. Accordingly, the SHBC maintains that if the Legislature sought to bind itself to providing any additional coverage, it would have explicitly done so.
In interpreting whether N.J.S.A. 52:14-17.29e mandates the treatment sought for autism, we must consider that the Legislature included identical language in both of the parity statutes, including an identical definition of BBMI specifically identifying autism. Passed within seven months of each other in the same legislative session with the same Senate and Assembly sponsors, the parity statutes have a common purpose, and therefore, should be read in harmony, not in conflict. F & W Assocs. v. County of Somerset Planning Bd., 276 N.J.Super. 519, 525-26, 648 A.2d 482 (App.Div.1994). Furthermore, the statements to the identical Senate and Assembly bills stated that the purpose of the legislation governing the State Health Benefits Program was "to require that the [SHBC] provide the same coverage for biologically-based mental illnesses to persons covered under [the Program] as required for other health insurers and health maintenance organizations" under the legislation applicable to carriers. S. 2277, 208 Leg. (N.J. 1999); Assemb. 3588, 208 Leg. (N.J. 1999).
We agree with the interpretation of the statutory language by the DOBI, and find that it is equally applicable to N.J.S.A. 52:14-17.29e. The SHBC's restrictive literal reading conflicts with the legislative intent and purpose of the act. It is a cardinal rule of statutory construction that the act must be read "sensibly rather than literally, with the purpose and reason for the legislation controlling." Reisman v. Great Am. Recreation, Inc., 266 N.J.Super. 87, 96, 628 A.2d 801 (App.Div.) certif. denied, 134 N.J. 560, 636 A.2d 519 (1993). The motivation and spirit of the parity statutes is to afford greater coverage to those afflicted with BBMIs. However, the SHBC's exclusion of treatment for autism eviscerates that purpose and renders the act a nullity.
N.J.S.A. 52:14-17.29d specifically denotes autism as a BBMI, and the following subsection of 17.29e seeks to remedy unfairness and inequality in its treatment when compared with coverage for physical conditions or sickness. Yet the SHBC excludes coverage for the only accepted treatment of autism, thereby excluding autism from coverage despite the legislative directive to the contrary in N.J.S.A. 52:14-17.29e. If the SHBC is correct in its reading, the statute would appear to promise much, but it really grants little or nothing for an autistic child. We cannot infer such a cruel intent by the Legislature.
The wording of the statute cannot be considered apart from its purpose and spirit. When a literal reading leads to a result contrary to the purpose and design of legislation, the spirit of the law controls the letter of the law. N.J. Builders, *850 Owners and Managers Ass'n v. Blair, 60 N.J. 330, 338, 288 A.2d 855 (1972); Jersey City Chapter of Prop. Owner's, etc. v. City Council, 55 N.J. 86, 100, 259 A.2d 698 (1969); Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 57-8, 766 A.2d 312 (App.Div.2001). The spirit and stated intention of N.J.S.A. 52:14-17.29e cannot be read to exclude the medically necessary treatment for an autistic child.
By establishing the State Health Benefits Program, the State manifested its intention to put health benefits for State employees on a parity with those in the private sector who are afforded coverage through the commercial insurance market. Heaton v. State Health Benefits Comm'n, 264 N.J.Super. 141, 151, 624 A.2d 69 (App. Div.1993). But the SHBC's interpretation sub judice does the opposite and is contrary to the goals of the program. As we have previously stated,
The goal of the State Health Benefits Program Act is to provide comprehensive health benefits for eligible public employees and their families at tolerable costs. It establishes a plan for State funding and private administration of a health benefits program which will protect State employees from catastrophic health expenses, and which encourages public employees to rely on the Program instead of seeking protection in the commercial insurance market.
[Id. at 151, 624 A.2d 69.]
There can be little doubt that the Program is an inducement to public service. It is the sole source of medical benefits coverage for tens of thousands of State employees and their only protection from catastrophic medical expenses. While the SHBC has wide discretion to define benefit limits and exclusions from coverage, its statutory authority is circumscribed by the goals of the Program and the reasonable expectation of its participants.
In G.B. v. State Health Benefits Comm'n, 222 N.J.Super. 83, 535 A.2d 1010 (App.Div.1988), decided prior to the mental health benefits parity laws, we held that the SHBC lacked statutory authority to exclude from coverage those totally disabled by mental illness while allowing coverage for those suffering from mental retardation or physical disability. We stated that

N.J.S.A. 52:14-17.29(B), in our view, only gives the Commission the right to limit the extent of benefits payable to those persons provided with coverage and to circumscribe on a fair and rational basis those who are deemed eligible for extended coverage. We cannot, however, reasonably conclude that the Legislature intended to invest the Commission with the authority to exclude certain categories of dependents who were totally disabled based solely on the cause of the disability. When a dependent cannot provide for himself, the cause of the disability is irrelevant to and does not alter the burden upon the state employee.
[Id. at 90, 535 A.2d 1010 (emphasis supplied).]
In this case the denial of coverage for Jake's prescribed treatment is couched in terms of the contractual exclusion of benefits for non-restorative speech, physical and occupational therapy, but the medical evaluations of Jake indicate that the therapy is the only treatment modality for an autistic child. Denial of the treatment amounts to exclusion from coverage of a class of dependents, notably afflicted children, based on the nature of their mental illness, which is beyond the limits of the statutory authority of the SHBC.
The exclusion as applied by SHBC is contrary to the goal of the State Health Benefits Program because it would lead to *851 the anomalous and unacceptable conclusion that while medically necessary treatment for autistic children is mandated for dependents of those insured by "carriers," an unfortunate State employee who has an autistic child must bear the entire cost of necessary treatment in addition to the emotional burden of having a child afflicted by this incurable and mysterious illness. This result runs contrary to the core of the State Health Benefits Act. As we stated in Heaton, supra,
By undertaking that very consequential role in the financial security of public employees and their families, the State also undertakes to play fair with them. Hidden or unfair reservation in insurance policies are ignored because they do not reflect the reasonable expectation of the parties [citations omitted] because of the significance of health insurance to public employees and their families, and the Legislature's undertaking to furnish insurance and determine its scope, one of the goals of the Legislature must have been to insure the fair and even-handed application of Program provisions, and the avoidance of crammed interpretations of ambiguous terms.
[Heaton, supra, 264 N.J.Super. at 151-152, 624 A.2d 69.]
Unlike the DOBI, the SHBC has not dealt with coverage for treatment of autism and other BBMIs through the regulatory process, although we have suggested that it do so due to the absence of any regulation delineating what benefits are covered and which are excluded beyond the minimum specified in N.J.S.A. 52:14-29. Heaton, supra, 264 N.J.Super. at 152-53, 624 A.2d 69. Instead, the SHBC continues its reliance on the catch-all language of N.J.A.C. 17:9-2.14, which adopts by reference all provisions in the contract with State employees and excludes any other benefits. Read literally, this regulation would grant the SHBC discretion to pick and choose coverage and exclude any sickness or treatment. There is no statutory basis for such unbridled discretion. An administrative agency may not exercise its delegated authority to alter the terms of a statute or frustrate its underlying policy. N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980); Siri v. Bd. of Trs. of Teachers' Pension & Annuity Fund, 262 N.J.Super. 147, 152, 620 A.2d 440 (App.Div.1993).
The SHBC maintains that the medical benefits contract in the Member's Handbook clearly and unambiguously state that speech and other therapy treatments for development of skills and functions not yet realized are excluded, and, as a result, State employees are bound to its terms. The Program language is not to be read in the same light as a commercial insurance policy as a contract of adhesion, but is to be interpreted and applied with its legislative intent and purpose as well as the reasonable expectation of the State employees for whom it provides medical benefits. Heaton, supra, 264 N.J.Super. at 151, 624 A.2d 69. In this regard, the insurance market is a guidepost for interpretation of benefits coverage since the Program was established with the intention of putting State employees on an equal footing with those covered by commercial medical benefits policies.
The reasonable expectations of both the State and the insured public employees are reached in large part after a consideration of the scope of the protections offered by the commercial insurance market. If Program provisions compatible with the statute appear to furnish protection consistent with the offerings of the commercial insurance market, those provisions should be interpreted in a consistent manner. Thus, judicial interpretations *852 of coverage provisions of commercial insurance contracts should guide, if not control, interpretation of Program provisions.
[Id. at 152, 624 A.2d 69.]
As with other insurance contracts, terms of the State benefits contracts excluding or limiting coverage are to be scrutinized with care. If the language supports two interpretations, the one favoring coverage is to be adopted. Charles Beseler Co. v. O'Gorman & Young, Inc., 188 N.J. 542, 911 A.2d 47 (2006); Lundy v. Aetna Cas. & Sur. Co., 92 N.J. 550, 559, 458 A.2d 106 (1983); Ryan v. State Health Benefits Comm'n, 260 N.J.Super. 359, 363, 616 A.2d 952 (App.Div.1992). As stated by us in Ryan,
Exclusionary language in an insurance contract is strictly interpreted. Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970). The SHBP is no different. It deals with the same kinds of consumers of insurance protection, who accept what is available and try to find its meaning. An ambiguity exists where the policy language is so confusing that the average policy holder cannot make out the boundaries of coverage. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247, 405 A.2d 788 (1979).
[Ryan, supra, 260 N.J.Super. at 363, 616 A.2d 952.]
Far from accepting the SHBC contention that the exclusion of the prescribed therapy for Jake is clearly set forth in the NJPLUS contract, we find the exclusionary language to be ambiguous, as witnessed by the fact that Horizon initially approved speech therapy. Furthermore, the SHBC interpretation foreclosing non-restorative benefits is undercut by another Handbook provision indicating that speech therapy is covered after surgery "to correct a defect that existed at birth and impaired the ability to speak or would have impaired the ability to speak."
In addition, while the Handbook excludes treatment for development of a function or skill beyond that previously demonstrated, there is no definition of "development" or "developmental." Children are constantly developing. "Developmental" defines childhood. The words "restorative" and "non-restorative" when used in this context are also ambiguous and largely inapplicable to infants and young children. Every child is born with the potential to develop those skills necessary to life in society. Autistic children and other children afflicted with BBMIs are hindered from achieving that potential. The treatment for Jake can restore some of his potential. Even with the therapies described, Jake's prognosis is uncertain, but there is no claim that the treatment is futile. To the contrary, there is the expectation that, to some degree, he will share the skills and functions of more fortunate children, including his siblings.
The prescribed treatment for Jake is traditional, not exotic or wasteful of resources.[3] Nor can we assume that inclusion of occupational or speech therapy for the small number of autistic children will significantly affect the fiscal burden of the State Health Benefits Program or hinder the mission of the SHBC to provide a comprehensive health program for State employees and their dependents at reasonable cost. We find no legislative goals to be advanced by the denial of the benefits sought and no statutory authority to do so. The decision of the SHBC is antithetical to the purpose and spirit of the State Health Benefits Program, the reasonable expectation of its participants, the legislative intention *853 of equal treatment for BBMIs and the public policy of this State for the nurturing of children.
We hold the exclusions relied upon by the SHBC to deny coverage for the treatment sought for autism are void. We direct that speech and occupational therapy be instituted for Jake without delay, and that the date of coverage is retroactive to the date of the initial petition.
Reversed.
NOTES
[1] N.J.S.A. 17:48-6v; 17:48A-7u; 17:48E-35.20; 17B:26-2.1s; 17B:27A-19.7; 26:2J-4.20; and 34:11A-15.
[2] N.J.S.A. 52:14-17.29b (inpatient coverage for mastectomy); N.J.S.A. 52:14-17.29c (treatment of inherited metabolic diseases); N.J.S.A. 52:14-17.29f (pap smear expenses); N.J.S.A. 52:14-17.29j (female contraceptives).
[3] See general discussion, David Orenhicher, Destructuring Disability: Rationing of Health Care and Unfair Discrimination Against the Sick, 31 Harv. C.R.-C.L. L.Rev. 49 (1996).