NEW JERSEY BUILDERS, OWNERS AND MANAGERS AS-
SOCIATION, A CORPORATION OF THE STATE OF NEW
JERSEY, *ET AL.*, PLAINTIFFS-APPELLANTS, v. JAMES
H. BLAIR, DIRECTOR OF THE DIVISION ON CIVIL
RIGHTS, A PART OF THE DEPARTMENT OF LAW AND
PUBLIC SAFETY, STATE OF NEW JERSEY, *ET AL.*, DE-
FENDANTS-RESPONDENTS.

Argued December 6, 7, 1971—Decided March 27, 1972.

332

Mr. *Richard F. Aronsohn* argued the cause for appellants (*Messrs. Kahn and Aronsohn*, attorneys; *Mr. Aronsohn*, on the brief).

Mr. *David H. Ben-Asher*, Deputy Attorney General, argued the cause for the respondents (*Mr. George F. Kugler, Jr.*, Attorney General of New Jersey, attorney; *Mr. Stephen Skillman*, Assistant Attorney General, of counsel; *Mr. Ben-Asher*, on the brief).

The opinion of the Court was delivered by

MOUNTAIN, J., Plaintiffs challenge the validity of a rule promulgated by the Division on Civil Rights. The regulation, which seeks to implement the Law Against Discrimination, *N. J. S. A.* 10:5–1 *et seq.*, is said to conflict wtih provisions of the statute itself and further to have been adopted in an improper fashion.

On April 9, 1970, the Division on Civil Rights announced in the *New Jersey Register*, 2 *N. J. R.* 36, that it proposed to adopt a Multiple Dwelling Reporting Rule,[1] the text of which was set forth in compliance with the Administrative Procedure Act, *N. J. S. A.* 52:14B–4. A hearing was duly held and subsequently, on October 8, 1970, the Regulation, now somewhat modified from the form in which it had been originally published, was officially adopted. Thereupon plaintiffs initiated this action in lieu of prerogative writ. Although commenced in the Law Division, since the suit sought to review the validity of a rule promulgated by a state administrative agency, it was transferred to the Appellate Di-

---

[1]The Rule will appear in the Administrative Code as *N. J. A. C.* 13:10–1, *et seq.*

vision. *R.* 2:2–3(a)(2). While it was there pending unheard, we granted the motion of the Attorney-General for certification. *R.* 2:12–2(a).

The Rule requires all owners of multiple dwellings having twenty-five or more units to file an annual report with the Division on Civil Rights supplying information as to the racial designation of tenants and applicants, as well as rental turn-overs, rental recruiting techniques, and the size and rental rates of apartments. *N. J. A. C.* 13:10–2. As published, the rule is accompanied by an instruction sheet and a reporting form designed to facilitate the submission of the required information. During the course of oral argument, we were advised that the Division was in the process of drafting revised instructions to assist landlords in complying with the Rule and filling out the reporting form. These have since been completed and published. They add to the original instructions additional provisions indicating the manner in which racial and ethnic identity of tenants and applicants is to be determined. Four categories are designated: "black," "Spanish surnamed," "white," and "other." It is recommended that identification be made as far as possible by visual observation. Inquiry is discouraged and to be resorted to only if no other method of classification is possible. Upon the rare occasions when inquiry proves necessary, the inquirer must inform the tenant or applicant that the information sought is required by a Rule of the Division on Civil Rights.

Plaintiffs basically contend that by requiring this compilation and submission of racial statistics the Rule offends the very statute it seeks to enforce. The Law Against Discrimination provides that:

It shall be * * * an unlawful discrimination:

\* \* \* \* \* \* \* \*

g. For the owner, lessee, sublessee, assignee or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent, lease, assign, or sublease any real property or part or portion thereof, or any agent or employee of any of these:

\* \* \* \* \* \* \* \*

(3) To print, publish, circulate, issue, display, post or mail, or cause to be printed, published, circulated, issued, displayed, posted or mailed any statement, advertisement, publication or sign, or to use any form of application for the purchase, rental, lease, assignment or sublease of any real property or part or portion thereof, or to make any record or inquiry in connection with the prospective purchase, rental, lease, assignment, or sublease of any real property, or part or portion thereof which expresses, directly or indirectly, any limitation, specification or discrimination as to race, creed, color, national origin, ancestry, marital status or sex or any intent to make any such limitation, specification or discrimination, and the production of any such statement, advertisement, publicity, sign, form of application, record, or inquiry purporting to be made by any such person shall be presumptive evidence in any action that the same was authorized by such person; provided, however, that nothing contained in this subsection shall be construed to bar any person from refusing to sell, rent, lease, assign or sublease or from advertising or recording a qualification as to sex for any room, apartment, flat in a dwelling or residential facility which is planned exclusively for and occupied by individuals of one sex to any individual of the exclusively opposite sex on the basis of sex. [*N. J. S. A.* 10:5-12]

Plaintiffs' argument may be framed thus: the statute forbids an owner of real property, such as a landlord, to make or record with respect to tenants or applicants, any specification as to race, creed, color, national origin, ancestry, marital status or sex, whereas the rule requires such record and specification. Since a rule must be deemed invalid which directs a course of conduct explicitly forbidden by the statute which the regulation seeks to implement, *Cole Nat. Corp. v. State Bd. of Examiners,* 57 *N. J.* 227, 231 (1970); *In re Weston,* 36 *N. J.* 258, 263-264 (1961), *cert.* den. 369 *U. S.* 864, 82 *S. Ct.* 1029, 8 *L. Ed.* 2d 84 (1962), plaintiffs insist that this rule must fall.

Thus we turn to the statute which, it is argued, forbids adoption of the Multiple Dwelling Reporting Rule. This law was originally adopted in 1945 (*L.* 1945, *c.* 169) and was designed to eliminate practices of discrimination. By a later amendment (*L.* 1951, *c.* 64), the Legislature specifically found and declared such practices to be a matter of concern to the government of the State; that discrimination threatened not only the rights and privileges of its inhabi-

tants but menaced the institutions and foundation of a free democratic society. *N. J. S. A.* 10:5–3. Over the years this act has been frequently amended and supplemented, always to enlarge the ambit and scope of the power of the agency to combat the evil of discrimination, whether based upon race, religion, color or national ancestry. Most recently (*L.* 1970, *c.* 80) discrimination by reason of marital status or sex has been brought within the prohibition of the legislation.

If there is any internal inconsistency in the statutory scheme, either appearing in the words of the enactment or emerging upon its implementation by the agency—as is perhaps here the case—reference to the fundamental purpose of the act will provide the touchstone to resolve the dilemma. Our Law Against Discrimination has been on the books for more than a quarter of a century but it is a matter of common knowledge that the evils it sought to control have been by no means eradicated. Indeed, in many areas little progress seems to have been made. Among these areas is housing. Although perhaps not as rampant and blatant as was once the case, discrimination in this vital area, often now more subtly conceived and undertaken, still persists. As first enacted, the statute sought to rely upon individual complaints as an initiating source of agency action. Experience, however, made it clear that more aggressive means must be employed if satisfactory results were to be obtained. See *Frakt, Administrative Enforcement of Equal Opportunity Legislation in New Jersey*, 21 *Rutgers L. Rev.* 442, 446, 461, 476 (1967). It was with this in mind that the challenged rule was adopted. As the testimony at the hearing made clear, it was the hope and the expectation that the statistical data derived from the reports of property owners would serve to identify particular instances of housing discrimination and that where pronounced patterns of racial imbalance emerged these might offer appropriate targets for investigation and such action as might then be indicated.

■ So viewed, there is certainly nothing unreasonable about the Rule we are considering or the requirements it lays down. Assembling and evaluating these pertinent data may obviously be a rational approach toward fulfilling the responsibility with which the agency has been charged. Is this endeavor forbidden by the literal prohibitions embodied in the statute quoted above? We have no doubt that it is not.

It is now generally accepted that despite earlier statements describing the Constitution as being color blind, most notably that of Justice Harlan in *Plessy v. Ferguson,* 163 *U. S.* 537, 559, 16 *S. Ct.* 1138, 1146, 41 *L. Ed.* 256, 263 (1896), those who seek to end racial discrimination must often be acutely color conscious. And such a posture has gained wide acceptance. Thus this Court, in *Morean v. Bd. of Ed. of Montclair,* 42 *N. J.* 237 (1964), readily sustained a plan for the transfer and assignment of pupils within a school district, although the proposal was admittedly racially motivated and avowedly sought to control racial balance as among the several junior high schools. It was there contended by the plaintiffs that such action, directed to only some of the pupils within the district, was in violation of the equal protection clause. This court said,

Constitutional color blindness may be wholly apt when the frame of reference is an attack on official efforts toward segregation; it is not generally apt when the attack is on official efforts toward the avoidance of segregation. [42 *N. J.* at 243–244]

In *Porcelli v. Titus,* 431 *F.* 2d 1254 (3rd Cir. 1970), *cert.* den. 402 *U. S.* 944, 91 S. Ct. 1612, 29 L. Ed. 2d 112, the court reviewed action by the Board of Education and Superintendent of Schools of the City of Newark giving promotional advancement to a member of black teachers in preference to white teachers who at the time held higher rank on the so-called "promotional list." It was candidly admitted that one reason for the action taken was to alleviate the existing disparity between white and black principals and vice-principals. The court sustained the action against the

contention that the use of color in the selection process was a violation of the Fourteenth Amendment. It took note that the result sought was a more integrated faculty and concluded that conscious racial classification was legitimate if not indeed necessary to accomplish this purpose. See also *McDaniel v. Barresi,* 402 *U. S.* 39, 91 *S. Ct.* 1287, 28 *L. Ed.* 582 (1971).

As in the field of education, so too in the area of employment, courts have come to recognize that color consciousness may be essential if discrimination is to be overcome. For instance, in *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 *F.* 2d 159 (3rd Cir. 1971), *cert.* den. 404 U. S. 854, 92 S. Ct. 98, 30 L. Ed. 2d 95 (1971), the court was called upon to consider an apparent conflict between the mandate of the Civil Rights Act of 1964 which prohibits racial classification in employment[2] and the so-called Philadelphia Plan, an attempt by the Secretary of Labor to relieve the effects of years of discrimination within the Philadelphia trade unions. The Plan requires contractors in the Philadelphia area to formulate specific employment programs utilizing minority workers before they may qualify for federally funded contracts. Proper adherence to the Plan compels an employer to list and classify employees by race, while in some instances giving preference to non-whites. The court was of the opinion that no conflict existed between the goals of the Civil Rights Act and the Plan. Rather it

---

[2](a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. [42 *U. S. C.* § 2000e-2(a)]

was held that color-consciousness was a proper posture for the executive branch of government to adopt in an effort to combat the evils of discrimination, though this might seem — very literally speaking — at variance with the command of Congress. Judge Gibbons, speaking for the court, said:

> To read § 703(a) [quoted in footnote 2, above] in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history. Clearly the Philadelphia Plan is color-conscious. Indeed the only meaning which can be attributed to the "affirmative action" language which since March of 1961 has been included in successive Executive Orders is that Government contractors must be color-conscious. Since 1941 the Executive Order program has recognized that discriminatory practices exclude available minority manpower from the labor pool. In other contexts color-consciousness has been deemed to be an appropriate remedial posture. Porcelli v. Titus, 302 F. Supp. 726 (D. N. J. 1969), aff'd, 431 F. 2d 1254 (3d Cir. 1970) ; Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 931 (2d Cir. 1968) ; Offermann v. Nitkowski, 378 F. 2d 22, 24 (2d Cir. 1967). It has been said respecting Title VII that "Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act." Quarles v. Philip Morris, Inc., supra, 279 F. Supp. at 514. The Quarles case rejected the contention that existing, nondiscriminatory seniority arrangements were so sanctified by Title VII that the effects of past discrimination in job assignments could not be overcome. We reject the contention that Title VII prevents the President acting through the Executive Order program from attempting to remedy the absence from the Philadelphia construction labor of minority tradesmen in key trades.

It will be seen that here, as in the case before us, support for the argument against color consciousness was sought to be had by pointing to its apparent legislative interdiction.

In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter. This doctrine permeates our case law.

When all is said and done, the matter of statutory construction
. . . will not justly turn on literalisms, technisms or the so-called
formal rules of interpretation; it will justly turn on the breadth
of the objectives of the legislation and the commonsense of the
situation. [*Jersey City Chapter Prop. Owner's, etc., Assoc. v. City
Council*, 55 *N. J.* 86, 100 (1969)]

[T]he spirit of the legislative direction prevails over its terms.
[*Dvorkin v. Dover Tp.*, 29 *N. J.* 303, 315 (1959)]

In reviewing certain municipal legislation Justice Heher,
in *San-Lan Builders, Inc. v. Baxendale*, 28 *N. J.* 148, 155
(1958), observed:

These regulations are to receive a reasonable construction and
application, to serve the plan and course of action of the lawgiver;
and in this quest for the true intention of the law, the letter gives
way to the obvious reason and spirit of the expression, and to this
end the evident policy and purpose of the act constitute an implied
limitation on the sense of general terms and a touchstone for the
expansion of narrower terms. The will of the lawgiver is to be
gathered from the object and nature of the subject matter, the
contextual setting, and the mischief felt and the remedy in view.
Scholastic strictness is to be avoided in the search for the legislative
intention. *The particular terms are to be made responsive to the
essential principle of the law. It is not the words but the internal
sense of the act that controls.* Reason is the soul of law. [Emphasis
supplied]

In an earlier case the same Justice said,

The intention emerges from the spirit and policy of the statute
rather than the literal sense of particular terms. [*Caputo v. The
Best Foods*, 17 *N. J.* 259, 264 (1955)]

Moreover we think it fair to assume that the need for such
a rule as we are here considering probably did not occur to
the draftsman of the Law Against Discrimination; and fur-
thermore we think it fair to entertain the belief that had
such a need been foreseen, appropriate provision for such a
rule would have been forthcoming. The emergence after
enactment of problems and situations not anticipated by the
legislative imagination calls upon the judiciary for a sym-
pathetic response consonant with what one may presume the
legislature would have said had it indeed spoken.

It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end "words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms." *Alexander v. New Jersey Power & Light Co.*, 21 *N. J.* 373, 378 (1956); *Wright v. Vogt*, 7 *N. J.* 1, 6 (1951); *Glick v. Trustees of Free Public Library*, 2 *N. J.* 579, 584 (1949). [*New Capitol Bar & Grill Corp. v. Div. of Employment Sec.*, 25 *N. J.* 155, 160 (1957)]

See also *Jersey City Chapter Prop. Owner's, etc., Assoc. v. City Council,* above, *at* 101; *Frankfurter, Some Reflections on the Reading of Statutes,* 47 *Colum. L. Rev.* 527, 529 (1947).

We readily conclude that the challenged Regulation is a proper exercise of the rule making power with which the Legislature has seen fit to equip the agency. *N. J. S. A.* 10:5–8(d)(g).

 Plaintiffs further contend that submission of the required information may lead to the initiation of criminal proceedings against the property owner and that therefore the rule violates his privilege against self-incrimination. However, it is sufficient at this time to note that the argument is premature. The privilege against self-incrimination is personal in nature. *Burton v. Sills,* 53 *N. J.* 86, 104 (1968), appeal dismissed 394 *U. S.* 812, 89 *S. Ct.* 1486, 22 *L. Ed.* 2d 748 (1969); *State v. Toscano,* 13 *N. J.* 418, 423 (1953) and must normally be claimed by the individual who seeks to avail himself of its protection. *Communist Party of U. S. v. Subversive Activities Control Board,* 367 *U. S.* 1, 107, 81 *S. Ct.* 1357, 1416, 6 *L. Ed.* 2d 625 (1961). Here no one has asserted the privilege. If and when this is done, the issue can be appropriately considered within the factual context then presented. We note in passing, however, as the Attorney General points out, that most multiple dwelling landlords are corporations, as to whom the privilege is not in any event

available. *George Campbell Painting Corp. v. Reid,* 392 *U. S.* 286, 88 *S. Ct.* 1978, 20 *L. Ed.* 2d 1094 (1968) ; *Hale v. Henkel,* 201 *U. S.* 43, 26 *S. Ct.* 370, 50 *L. Ed.* 652 (1906) ; *Wilson v. U. S.,* 221 *U. S.* 361, 31 *S. Ct.* 538, 55 *L. Ed.* 771 (1911). Moreover the privilege "does not protect against disclosure of records required to be kept by law in order that there may be suitable information of transactions which are the appropriate subject of governmental regulation and the enforcement of restrictions validly established." *Bianchi v. Hoffman,* 36 *N. J. Super.* 435, 438 (App. Div. 1955).

It is also urged that the rule was improperly adopted in that all requirements of the Administrative Procedure Act, *N. J. S. A.* 52 :14B–4, were not met. Again we disagree. The notice published in the *New Jersey Register* on April 9, 1970 included the text of the proposed rule as well as an invitation to all interested parties to attend a public hearing where comments, suggestions, recommendations, additions and modifications to the proposed rule would be considered. Newspaper articles with respect to the proposed hearing appeared in four of the leading newspapers circulating in northern New Jersey. Plaintiffs' counsel appeared at the hearing, testified fully and submitted a written statement setting forth his client's position. Quite obviously all notice and hearing requirements were met. *N. J. A. C.* 15 :5–3.5. See *Motyka v. McCorkle,* 58 *N. J.* 165, 179–181 (1971).

In view of what has been said above the plaintiffs' attack upon the aforementioned regulation is rejected and the action of the Division on Civil Rights in adopting it is hereby affirmed.

*For affirmance*: Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal*: None.