176 N.J. Super. 455 (1980)
423 A.2d 695
IN THE MATTER OF THE GRAND JURY SUBPOENA OF FAWN VRAZO.
Superior Court of New Jersey, Law Division Camden County.
Decided December 2, 1980.
*457 Warren W. Faulk for petitioner (Brown, Connery, Kulp, Wille, Purnell & Greene, attorneys).
John B. Mariano, Prosecutor of Camden County, for the State (Raymond Milavsky and James E. Isman, Assistant Prosecutors, on brief).
SIMPSON, J.A.D. (temporarily assigned).
Petitioner, a reporter with a Philadelphia newspaper, the Bulletin, moves to quash a subpoena requiring her to appear and testify before the Camden County Grand Jury. R. 1:9-1 and 2. Fawn Vrazo is a Pennsylvania resident and her appearance was *458 pursuant to the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings. N.J.S.A. 2A:81-18 et seq. At a hearing before the Court of Common Pleas of Philadelphia County she did not oppose the issuance of the subpoena-with full reservation of her right to litigate, in the New Jersey courts, claimed privileges or other constitutional protections not to appear or testify before the grand jury.
The operative facts are not in dispute. The Camden Grand Jury is investigating allegations of theft by deception, N.J.S.A. 2C:20-4, as a result of an article written by Vrazo in the March 23, 1980 issue of the Bulletin. The article reports the results of an investigation by Vrazo and Bulletin staff reporters John Fuchs and William P. Barrett. Camden City public payroll irregularities are charged, including allegations that "double dippers" (persons holding two jobs simultaneously) are "no-show" or "part-show" workers who are paid from public funds for hours they do not actually work. The article reports details obtained from confidential sources, as well as personal surveillance by Vrazo of alleged offenders.
By consent, the appearance date of the subpoena has been continued until the decision on this motion to quash. Petitioner claims the protection of the newsperson's privilege, Evid.R. 27 (N.J.S.A. 2A:84A-21); the prosecutor concedes the privilege extends to confidential sources, but seeks Vrazo's appearance and testimony pursuant to the "eyewitness" exception under N.J.S.A. 2A:84A-21a (subdivision h). Petitioner and prosecutor also disagree as to whether the privilege has been waived by previous disclosure pursuant to Evid.R. 37 (N.J.S.A. 2A:84A-29).

I. The Constitutions
The First Amendment to the United States Constitution guarantees freedom of the press. So does Article I, paragraph 6 of *459 the 1947 New Jersey Constitution. In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court of the United States noted that at common law there was no privilege of newspersons to refuse to reveal confidential sources or information to a grand jury. The court recognized the collision of great principles: without some protection for seeking out the news, freedom of the press could be eviscerated vs. the public's right (through the grand jury) to every man's evidence relative to an investigation into the commission of crime. For a 5-4 majority Justice White wrote:
The issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment. We hold that it does not [Id., 408 U.S. at 667, 92 S.Ct. at 2649, 33 L.Ed.2d at 631 (1972)]
Justice White's majority opinion additionally stated:
There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute. [Id. 408 U.S. at 706, 92 S.Ct. at 2665, 33 L.Ed.2d at 654 (1972)]
Although the claim was advanced in In re Bridge, 120 N.J. Super. 460 (App.Div. 1972), certif. den. 62 N.J. 80 (1972), cert. den. 410 U.S. 991, 93 S.Ct. 1500. 36 L.Ed.2d 189 (1973) no New Jersey court has even construed our state constitutional guaranty of liberty of the press to provide a reporter's privilege. It is also unnecessary to address such an inquiry at this time, because our Legislature has enacted a "shield law."

II. The Shield Law
Statutes in a number of jurisdictions grant newspersons privileges, of varying breadth and nature, not to disclose sources or information obtained in their professional capacity. Annotation, "Privilege of Newsgatherer Against Disclosure of Confidential *460 Sources or Information", 99 A.L.R.3d 37 (1980). New Jersey's shield law[1] provides, in pertinent part:
Subject to Rule 37, a [newsperson] ... has a privilege to refuse to disclose ... to, any ... grand jury ...
a. The source ... from or through whom any information was procured, obtained, ... delivered; and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
...
Unless a different meaning clearly appears from the context of this act, as used in this act:
...
h. "In the course of pursuing his professional activities" means any situation, including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public, but ... does not include any situation in which a reporter is an eyewitness to, or participant in, any act involving physical violence or property damage.
Evidence Rule 37,[2] referred to in our shield law, but applicable also to privileges of other than a newsperson, provides in pertinent part:
A person waives his right or privilege to refuse to disclose ... a specified matter if he ... (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter ...
A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State ... shall not constitute a waiver under this section....
As already noted, a reporter had no privilege at common law. Branzburg v. Hayes, supra; In re Grunow, 84 N.J.L. 235 (Sup. Ct. 1913). A predecessor statutory privilege, N.J.S.A. 2A:84A-21, also known as Evidence Rule 27, was enacted by our Legislature as L. 1960, c. 52, § 21, eff. July 1, 1960, and provided in full:
Subject to Rule 37[2], a person engaged on, connected with, or employed by, a newspaper has a privilege to refuse to disclose the source, author, means, agency or person from or through whom any information published in such newspaper was procured, obtained, supplied, furnished, or delivered.
*461 In the Bridge case, supra, it was held that a newsman had waived his Rule 27 "source" privilege, pursuant to Rule 37, by disclosing his source and at least part of the information received from such source. In the present case the source of her information has not been disclosed by Vrazo, and it is not disputed that the "source" or subparagraph "a" privilege of the present shield law, cited above, remains available. The prosecutor contends, however, that the "information" or "b" privilege has been lost by waiver relying upon Rule 37, since at least part of the privileged matter has been disclosed in the Bulletin article. The reporter, of course, relies upon the "whether or not it is disseminated" clause of the "b" privilege. To the extent there is an irreconcilable conflict, the "b" privilege must prevail, since it results from a 1977 act of the New Jersey Legislature while the partial disclosure waiver paragraph (first paragraph) of Rule 37 was passed in 1960. Brewer v. Porch, 53 N.J. 167, 173 (1969); 2A Sutherland, Statutory Construction (4 Ed. 1973, Sands), § 51.03. Rules 27 and 37 are statutes in pari materia, however, and must be construed together to ascertain the legislative intent thereof. State v. Brown, 22 N.J. 405, 415 (1956). The apparent conflict disappears when the second paragraph of Rule 37 is also considered-since it provides that a disclosure that is itself privileged does not constitute a waiver of the privilege. Rule 27, as amended in 1977 to include the "information" or "b" privilege, provides that disseminated news or information is privileged if "obtained in the course of pursuing his professional activities," and this is undisputed. Accordingly, there has been no waiver of the newsperson's privilege by partial disclosure.
The breadth of the "information" or "b" privilege is also clear from the legislative history of our shield laws. Although there is no record of any committee or other legislative hearings or reports on Senate Bill 322 that became our present Evidence Rule 27 (see footnote 1, supra), there is an absolute veto message of Governor William T. Cahill, dated March 2, 1973, that relates to a predecessor Senate Bill 1121 and illuminates the *462 present "information" privilege. The 1960 statutory privilege, cited above, was limited to the source of published information. Senate 1121 combined the "source" and a proposed "information" privilege in a single paragraph that read as follows (with brackets reflecting deletions from the originally introduced bill):
...
a. The source, author, means, agency or person from or through whom any information [published in such newspaper] was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered and b. any news or information [so] obtained in the course of pursuing his professional activities whether or not it is disseminated.
Governor Cahill's veto message noted that the privilege would extend to any reporter's eyewitnessing of a crime. It also said that the bill was an immediate and compassionate reaction to an incarceration of a newspaperman-which doubtless referred to the situation in the Bridge case, supra. The message did not specifically mention another important point, but the bracketed "so" in Senate 1121 makes it clear that the original form of the proposed legislation would have limited the "information" privilege to that obtained from the privileged source. By deleting the word "so," a qualified privilege would have arguably been converted to an absolute "information" privilege.
The foregoing makes it most probable that the Legislature in enacting Senate 322, and Governor Brendan T. Byrne in signing the amendment to Evidence Rule 27 into law on October 5, 1977 (see footnote 1, supra), were fully aware that the shield law was being extended from a "source" privilege to additionally an "information" privilege that was not limited to information obtained from a confidential source. The word "so" in the original form of Senate 1122 was omitted from Senate 322. Both the Legislature and Governor Byrne were aware, of course, that the "information" privilege was qualified by the clause and subsequent limiting definition of the words, "in the course of pursuing his professional activities". Additionally, the semicolon between the "source" or subparagraph "a" privilege of Senate 322 and the "information" or subparagraph "b" privilege *463 thereof makes it clear that these are independent privileges.[3]
Finally, the prosecutor supports enforcement of the subpoena by citing the "eyewitness" exception to the privilege otherwise pertaining to news or information obtained by a reporter "in the course of pursuing his professional activities." Possibly the Legislature recalled Governor Cahill's veto message as to Senate 1121 in 1973. In any event, Senate 322, in the form ultimately enacted into our current shield law, excluded from the privilege information arising out of a situation where a reporter is an eyewitness to any "act involving physical violence or property damage." This choice of language makes it clear that the Legislature did not mean to qualify the privilege in all eyewitness situations-but nowhere is there any definition of the terms in this limiting phrase. The prosecutor argues that Vrazo's reported observations, of workers at home while being paid to work, fall within the clause-the theory being that theft of public funds by deception constitutes "property damage." The reporter, of course, contends that such an interpretation strains the plain meaning of the statute. This issue, therefore, is one of statutory construction.
In determining the meaning of words used by the Legislature the overriding principle of statutory construction is that in the absence of an explicit indication of special meaning, words will be given their ordinary and well-understood meaning. Service Armament Co. v. Hyland, 70 N.J. 550, 556 (1976). In this same case Justice Clifford also noted that beyond the threshold examination of the plain meaning of language used in a statute containing an exception to a comprehensive statutory scheme, guidance should come from both the legislative intent and the general principle that exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the *464 manifest reason and purpose of the law. Id. at pp. 558-559. To bring Vrazo's observations within the exception to an otherwise privileged situation, the prosecutor relies upon a dictionary definition of "damage" and the New Jersey Code of Criminal Justice definition of "property."[4]Webster's Third New International Dictionary does define "damage," when the word is used as a noun, as "loss due to injury: injury or harm to person, property or reputation." But the relied-upon definition of "property" is specifically limited to chapters 20 and 21 of the Code. In a strictly literal sense, the language and definitions relied upon could support the prosecutor's position. But as noted by Justice Mountain in N.J. Builders, Owners and Managers Ass'n v. Blair, 60 N.J. 330 (1972).
In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter. This doctrine permeates our case law. [at 338].
And as stated by Justice Jacobs in Jersey City Chap. Prop. Owners, etc., Assoc. v. City Council, 55 N.J. 86 (1965):
When all is said and done, the matter of statutory construction here will not justly turn on literalisms, technisms, or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation. [at 100].
In common parlance the words "physical violence or property damage" connote personal injury or tangible property damage resulting from the exertion of force. They do not connote what is involved here-the alleged stealing of time or money that has been characterized as theft by deception and which happens to be located under Part 2, "Offenses Against Property," of the New Jersey Code of Criminal Justice. The acts might well be characterized as constituting a number of crimes located under Part 4, "Offenses Against Public Administration," which would further befog the issue.
*465 The New Jersey Supreme Court has held that the newsperson's privilege under our current shield law was intended to be as broad as possible, State v. Boiardo, 82 N.J. 446, 457 (1980); and was a direct response to the Branzburg and Bridge cases, supra, In re Farber, 78 N.J. 259, 303 (1978) (Handler, J. dissenting). The legislative intent, the legislative history, the purpose and design of the act, the spirit of the law, and the breadth of the objectives of the legislation-all evidence a desire to create a broad shield for the news media. The limited "eyewitness" exception must therefore be strictly construed. The common sense of the present situation is that the acts of the reporter are privileged and do not fall within the exception.

III. Conclusion
Notwithstanding the foregoing, the Legislature might well re-examine our shield law, just as it did following the Farber case, supra, and which resulted in amendments reviewed by Chief Justice Wilentz in his opinion for the majority in the Boiardo case, supra. Both the "waiver" and "exception" clauses hereinabove referred to could use further legislative clarification.
The granting of a newsperson's privilege is a matter for the Legislature and not for the courts, as pointed out by Judge Collester in the Bridge case, supra at 468. The history of oppression and censorship of the press is world-wide and spans centuries.[5] The need for a free and robust press, protected by a newsperson's privilege, has been fully documented by Justice Pashman in his dissent in Farber, as well as the dissenters in Branzburg. The conflicting compelling interest, of course, is the need by a grand jury of all relevant evidence when properly investigating criminal conduct, as set forth by Justice Mountain for the majority in Farber, and in the majority *466 opinion in Branzburg. Although the balancing of these conflicting interests on a case-by-case basis may be best when constitutional questions arise, as Justice Powell asserts in his concurring opinion in Branzburg, the need for legislative clarification of our statutory shield law is essential for both prosecutors and the news media. Although the American Bar Association Fair Trial and Free Press Standards[6] do not presently address the subject of shield laws, comparative reference is made to Standard 8-4.2 which provides a limited exception for representatives of the news media to exercise of the judicial contempt power for violations of valid non-disclosure orders.
The subpoena is quashed.
NOTES
[1] N.J.S.A. 2A:84A-21 and 21a, also known as Evidence Rule 27, as amended by L. 1977, c. 253, eff. October 5, 1977.
[2] N.J.S.A. 2A:84A-29 and being L. 1960, c. 52, § 29, eff July 1, 1960.
[3] Kolb, A Writer's Guide, The Essential Points, 67 (1980).
[4] N.J.S.A. 2C:20-1 g: "`Property' means anything of value, including real estate, tangible and intangible personal property, trade secrets ..."
[5] Salmon. The Newspaper and Authority (1923).
[6] ABA Standards for Criminal Justice (2d ed. 1980), 8-1.1. et seq.