123 N.J. 481 (1991)
589 A.2d 135
IN THE MATTER OF WOODHAVEN LUMBER AND MILL WORK.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
ASBURY PARK PRESS, DEFENDANT-RESPONDENT.
The Supreme Court of New Jersey.
Argued January 29, 1991.
Decided April 23, 1991.
*482 Samuel J. Marzarella, Assistant Prosecutor, argued the cause for appellant (James W. Holzapfel, Ocean County Prosecutor, attorney; Samuel J. Marzarella, on the briefs).
Richard M. Eittreim argued the cause for respondent (McCarter & English, attorneys; Richard M. Eittreim and Penelope M. Taylor, on the briefs).
The opinion of the Court was delivered by GARIBALDI, J.
This interlocutory appeal involves an interpretation of the eyewitness exception to New Jersey's Press Shield Law, N.J.S.A. 2A:84A-21; Evidence Rule 27 ("Shield Law"). Under the part of the Shield Law known as the eyewitness exception, a news-medium employee who "in the course of pursuing his professional activities" is an eyewitness to "any act involving physical violence or property damage," N.J.S.A. 2A:84A-21a(h); Evid.R. 27, may not use the newsperson's privilege to avoid disclosing that information. Specifically, the Court must decide whether three news photographers who photographed a burning fire were "eyewitnesses" to an "act involving property damage" and therefore not protected by the Shield Law.

I
On September 11, 1989, a fire broke out at the Woodhaven Lumber Works in Bricktown, New Jersey. Three photographers from defendant, Asbury Park Press ("Press"), were dispatched to the scene of a fire. The following day, the Press published articles accompanied by aerial photographs of the fire that the photographers had taken from a helicopter. The State alleges that a Press representative had agreed to its request for the published photographs but had stated that a subpoena *483 would be necessary for the unpublished photographs. The prosecutor's office served a subpoena duces tecum on the Press on September 15, 1989, directing the Press to appear before the Ocean County Grand Jury and produce "any and all photographs and negatives taken by Asbury Park Press personell [sic] or representatives."
The Press moved to quash the subpoena ten days later based on the Shield Law privilege. Each of the three photographers at the fire submitted an affidavit asserting that he was "one of the Press photographers sent to the scene of the fire" and that all photographs were taken "in the course of pursuing [his] professional activities." Each raised the Shield Law privilege as the basis "to refuse to disclose the photographs, negatives, and any other information gathered in connection with this story."
The State, however, claims that the Shield Law does not apply because the photographers were "eyewitnesses" to "an act involving property damage." In response to the trial court's request for supporting material, the prosecutor's office provided an affidavit from Sgt. Larry Wilson, the commander of the office's Arson Response Unit. In his affidavit, Sgt. Wilson explained that "there is a good likelihood that the photos and negatives in the possession of the Asbury Park Press will be helpful to our investigation," and that they will "reveal highly relevant information about the fire."
He stated that the State's photographs of the fire are imperfect for several reasons, including "poor height perspective, smoke distortion problems and time factors." Sgt. Wilson also asserted that the photographs published in the Press indicated good height perspective and no severe distortion from smoke and flame. He stated that because fire reconstruction by experts depends on the quality and perspective of photographs used, the Press' aerial views would enable the State to achieve a much better fire reconstruction than it could with any other photographs available to it or known to exist.
*484 The trial court granted the Press' motion and entered an order quashing the subpoena. The court found that the definition of "act" in the eyewitness exception includes the doing of a thing or deed and does not include all the resulting consequences. In the instant case, the act subject to the Shield Law exception would be the act of starting the fire. The trial court reasoned that because the photographers had arrived on the scene after the fire was already burning, they did not witness an "act involving... property damage" and could successfully assert their Shield Law privilege.
The Appellate Division, in a brief per curiam opinion, affirmed the trial court's decision substantially for the reasons stated therein. The court agreed with the trial court's distinction "between the act of setting the fire, which would be covered by the exception, and its aftermath, the fire in progress, which would not be the subject of the exception."
We granted the State's motion for leave to appeal. 122 N.J. 345, 585 A.2d 358 (1990).

II
The so-called "eyewitness exception" appears in the definition section of the Shield Law, also entitled the Newsperson's Privilege. The general rule, in pertinent part, provides as follows:
Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing, or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere:
a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated. [N.J.S.A. 2A:84A-21(a), (b); Evid.R. 27(a), (b).]
*485 "News" as defined in the statute includes "any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect." N.J.S.A. 2A:84A-21a(b) (emphasis added); Evid.R. 27 (emphasis added).
The eyewitness exception appears in definitional subsection "h," which specifies that
"[i]n the course of pursuing his professional activities" means "any situation, including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public, but ... does not include any situation in which a reporter is an eyewitness to, or participant in, any act involving physical violence or property damage." N.J.S.A. 2A:84A-21a(h) (emphasis added); Evid.R. 27 (emphasis added).
That the three Press photographers are employed by the news media and that the photographs were taken by them in the course of their professional activities is uncontested. The conflict, therefore, centers on whether those three photographers, in taking the photographs, were eyewitnesses to "any act involving physical violence or property damage."

III
Although this Court has previously addressed and sanctioned several of the press privileges set forth in the Shield Law, we have not directly considered the eyewitness exception. In interpreting that exception we rely on well-established principles of statutory construction. We consider, in turn, the plain meaning of the statutory language, the statutory scheme, and the general public policies underlying the Shield Law as reflected in statutory amendments and judicial decisions.
Standard principles of statutory interpretation direct us initially to examine the language of the statute. As we commented in our most recent decision addressing the Shield Law, In re Schuman, 114 N.J. 14, 552 A.2d 602 (1989), "it is axiomatic that in construing a statute one first considers its *486 plain language." Id. at 25, 552 A.2d 602 (citing Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 128, 527 A.2d 1368 (1987)).
In our construction of the eyewitness exception we note that "[t]he fact that the words in a statute have not been used before does not mean that they are ambiguous or unclear. The words should be given their common and approved usage." N. Singer, 2A Sutherland Statutory Construction § 46.01 (Sands 4th ed. 1984) (footnote omitted).
The primary issue is the meaning of the words "any act." The trial court found that "under the plain meaning of the language in the eyewitness exception, what is meant to be excluded from the protection of the privilege is the actual witnessing of the event or the act itself. And the Court finds that to be the act of starting the fire." The court stated that "the doing of the deed * * * does not include all resulting consequences, despite the fact that a person may have criminal responsibility based on resulting consequences of their action." In strictly construing the exception and ruling to quash the subpoena the trial court concluded that "the photographers did not witness an act, but arrived after the act and recorded the results of that action." The Appellate Division agreed with the trial court's interpretation.
The Press endorses the lower courts' narrow interpretation of the statutory language and urges that the exception apply to a reporter who is an eyewitness only to the act but not the consequences and effects of that act. In its view, the reporter is an eyewitness as a result of the coincidence of being in a certain place rather than when intentionally present in a certain place in pursuit of his or her press activities. For example, if a reporter walking down a street witnesses a mugging, clearly that reporter is an eyewitness.
The State, however, contends that the plain meaning of "act" is not so simply derived. The State maintains that the consequences and effects of an act are embodied in the plain meaning *487 of "act." Before addressing the philosophical and jurisprudential definitions on which the State relies, we first consider various definitions of "act" to help derive the term's plain meaning.
Many legal sources link the definition of "act" to human volition. For example, the Restatement (Second) of Torts § 2 (1965) defines "act" as "an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." (emphasis supplied) The Restatement illustrates that distinction by explaining that when an actor points a pistol at another and pulls the trigger, "the act is the pulling of the trigger and not the impingement of the bullet upon the other's person." Id. at comment c. Prosser and Keeton on the Law of Torts states that "an `act,' as that term is ordinarily used, is a voluntary contraction of the muscles, and nothing more. An act is to be distinguished from its consequences." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts, § 8, 34 (5th ed. 1984).
Black's Law Dictionary 24 (5th ed. 1979), on which the State relied heavily during the Law Division hearing, defines "act" as follows:
Denotes external manifestation of actor's will. Restatement, Second, Torts § 2. Expression of will or purpose; carries idea of performance; primarily that which is done or doing; exercise of power, or effect of which power exerted is cause; a performance; a deed.
Finally, a standard dictionary defines "act" as "the doing of a thing." Webster's Ninth Collegiate Dictionary 53 (1988).
The State draws on several theoretical definitions for its argument that "act" in the eyewitness exception "includes the effects or consequences thereof." The State's brief presents a philosophical contention that there is "no rigid distinction between action and consequences." Encyclopedia of Philosophy 100-101 (1967). Drawing from J. Austin's Lectures on Jurisprudence, the State sets forth the view that "[t]he only objects *488 which can be called acts are the consequences of volitions." J. Austin, Lectures in Jurisprudence XVIII, 1.427 (1979).
Philosophical definitions, although interesting, are not the soundest guides to determining the plain meaning of statutory language. Nearly half a century ago, Justice Frankfurter explained the fundamental tenet that "legislation when not expressed in technical terms is addressed to the common run of men and is therefore understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." Addison v. Holly Hill Fruit Prods., Inc., 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, 1496, reh'g denied, 323 U.S. 809, 65 S.Ct. 27, 89 L.Ed. 645 (1944).
Recognizing the importance of using the plain meaning of language for statutes, we find that the Restatement's description of "act" as "an external manifestation of the actor's will [exclusive of the results]" most closely captures the plain meaning of the language of the eyewitness exception. A survey of other jurisdictions reveals that most cases involving an eyewitness exception to press privileges involve newspersons who witnessed human participation in a crime or accident, lending support to our construction of "act." See Miami Herald Pub. Co. v. Morejon, 561 So.2d 577, 581 (Fla. 1990) (journalist required to testify about eyewitness observations of arrest and search of defendant); citing several cases, e.g., Lightman v. State, 15 Md. App. 713, 294 A.2d 149 (compelling testimony of reporter who saw drugs being sold), aff'd, 266 Md. 550, 295 A.2d 212 (1972), cert. denied, 411 U.S. 951, 93 S.Ct. 1922, 36 L.Ed.2d 414 (1973); Ex parte Grothe, 687 S.W.2d 736 (Tex. Crim. App. 1984) (reporter stands on same footing as a layperson with regard to personal observations of alleged criminal activity and therefore must testify), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985).
We recognize that the distinction between "act" and "result" made so easily in theory is often less obvious in reality. The instant case is "easy" in the sense that no one contends the *489 photographs portray the fire's perpetrator, thereby removing all elements of witnessed human volition connected with the purported act. However, a case involving photographs of a person running from a burning building with a can of kerosene and a lighted match in hand challenges any simple differentiation between act and result. Although we do not decide that case here, we recognize that the definition of "act" that we endorse today cannot operate as a mechanical and absolute test. The definition is intentionally restrictive but must nonetheless be applied with some amount of flexibility.

IV
Taking Justice Mountain's advice that "[i]n reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted," New Jersey Builders, Owners and Managers Ass'n v. Blair, 60 N.J. 330, 338, 288 A.2d 855 (1972), we now consider the landscape of the Shield Law's legislative history and decisions. We first note that there is no specific legislative history with regard to the eyewitness exception. We begin therefore with the fundamental public policies that underlie the Shield Law.
This Court's most recent examination of the Shield Law provides a thorough analysis of the statute's history and purposes. See In re Schuman, supra, 114 N.J. at 21-24, 552 A.2d 602. In tracing the Shield Law's evolution from its narrow enactment in 1933 through its expansion by amendments in the late 1970s, we found that the amendments clearly indicated the Legislature's continuing commitment to protect the press from compulsory testimony, particularly when such testimony is sought by the State. Id. at 24, 552 A.2d 602.
Decisions by this Court restricting the privilege motivated the Legislature to pass the privilege-expanding amendments. Id. at 21-22, 552 A.2d 602 (citing Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and In re Bridge, 120 N.J. Super. 460, 295 A.2d 3 (App.Div.), certif. denied, 62 N.J. *490 80, 299 A.2d 78 (1972), cert. denied, 410 U.S. 991, 93 S.Ct. 1500, 36 L.Ed.2d 189 (1973) (both of which allowed a grand jury access to a reporter's materials)). The 1977 amendments followed In re Bridge, in which a reporter was incarcerated for refusing to testify before a grand jury about the source's identity and information, expanded the "source" privilege to cover all sources of information and created an "information privilege" to protect information gathered in the scope of professional activities whether or not it is disseminated or derived from a confidential source. Id. at 22, 552 A.2d 602; see Evid.R. 27(a), (b).
The 1979 amendments responded to this Court's decision that a criminal defendant's right to exculpatory evidence outweighed press protections against compulsory process. In re Farber, 78 N.J. 259, 394 A.2d 330, cert. denied, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). In Farber, we established procedures by which criminal defendants may overcome the Shield Law privilege. The 1979 amendments incorporate Farber's holding and guidelines into law. See N.J.S.A. 2A:84A-21.3. However, although Farber recognized that disclosure may sometimes be mandated, it carefully restricted the circumstances for forced revelation to those in which a party's need for the information is "manifestly compelling." 78 N.J. at 267, 394 A.2d 330. In Schuman, we reiterated the narrow circumstances allowing for compelled disclosure, highlighting that Farber involved a request by a criminal defendant who can call on constitutional and statutory provisions unavailable to prosecutors. In re Schuman, supra, 114 N.J. at 28, 552 A.2d 602.
Other legislative actions also reflect a commitment to provide the press with enhanced protection from State interference. The New Jersey Wiretapping and Electronic Surveillance Control Act, for example, obligates the State to show "special need" before obtaining a legal wiretap of a newsperson's phone. N.J.S.A. 2A:156A-11. The federal law, in contrast, provides no analogous protection. See Biunno, Current N.J. Rules of Evidence, Comment 1 to Evid.R. 27. Furthermore, a *491 law recently enacted by the New Jersey Legislature narrowly circumscribes the situations in which the State can properly search and seize materials acquired in the course of newsgathering. N.J.S.A. 2A:84A-21.9 to -21.12. In contrast, the Supreme Court in Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), held that a general warrant adequately protected a newspaper's offices during a search and that a subpoena duces tecum was therefore unnecessary.
Several other cases further illustrate the contours of the press privilege. In holding that newspersons have an absolute privilege in civil libel actions, this Court affirmed that the Legislature intended the Shield Law to protect confidential sources and information gathered by news-media representatives "`to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey.'" Maressa v. New Jersey Monthly, 89 N.J. 176, 181, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982) (quoting In re Farber, supra, 78 N.J. at 270, 394 A.2d 330).
In State v. Boiardo, 82 N.J. 446, 414 A.2d 14 (1980) (Boiardo I), we reversed a trial court order to a reporter to produce a letter for in camera inspection, finding that the defendants who requested the letter failed to meet their burden of demonstrating the nonavailability of substantially-similar evidence through less intrusive means. Id. at 449, 414 A.2d 14. Likewise, in examining the Shield Law, the federal district court for the district of New Jersey commented that "New Jersey has decided that its Shield Law is both comprehensive and absolute and extends to cover the editorial process." Prager v. American Broadcasting Cos., 569 F. Supp. 1229, 1239 (1983), aff'd, 734 F.2d 7 (3d Cir.1984).
Completing the portrait of this Court's interpretation of the Shield Law, In re Schuman, supra, 114 N.J. 14, 552 A.2d 602, held that a reporter who in the course of his job gathered information that was published could not be compelled by the State to testify because the information was privileged. In *492 Schuman, we explained that the 1979 amendment, which provides that "[p]ublication shall constitute a waiver only as to the specific materials published," pertains exclusively to information sought by criminal defendants in preparing a defense. Id. at 27, 552 A.2d 602; see L. 1979, c. 479, 2A:84A-21.3.
In addition to recognizing that only criminal defendants receive the limited preference to compel testimony, we identified several fundamental policy considerations that inform our analysis of the eyewitness exception as well. First, we acknowledged that compelling testimony by court order may create the public perception that a reporter (or photographer) is actually an "arm of the prosecution." Id. at 29, 552 A.2d 602. Such a perception would likely increase a reporter's difficulty in gathering information from fearful sources and in turn "hinder the free flow of information from newspapers to the public." Ibid. Apprehension about compelled disclosure could cause a newsperson to be reluctant to disclose sources and information for fear of waiving the privilege. It might also lead a reporter to destroy notes and files. Ibid. Without adequate Shield Law protection, the reporters might be unable or unwilling to research and publish crime stories, in turn removing an often valuable source of information for law enforcement agencies. Ibid. Moreover, we noted that the burdens resulting from compliance or challenges to frequent prosecution subpoenas could interfere severely with the newsgathering activities of many newspapers. Ibid.
Until now, our courts have construed the eyewitness exception to New Jersey's Shield Law only once. See In re Vrazo Subpoena, 176 N.J. Super. 455, 423 A.2d 695 (Law Div. 1980). In that case, a grand jury investigating theft by deception issued a subpoena to a reporter who had written an article on public payroll irregularities. The prosecutor argued, among other points, that the reporter had been an eyewitness and lacked Shield Law protection. He claimed during her investigation the reporter had witnessed public employees who were listed on the payroll but were not working, and that that *493 alleged theft of public funds by deception constituted property damage.
Noting that there is no statutory definition of the exception, the court followed "the overriding principle of statutory construction ... that in the absence of an explicit indication of special meaning, words will be given their ordinary and well-understood meaning." Id. at 463, 423 A.2d 695 (citing Service Armament Co. v. Hyland, 70 N.J. 550, 556, 362 A.2d 13 (1976)). Drawing again on Service Armament Co., the court explained that in interpreting language of an exception to a comprehensive statutory scheme, it should seek guidance "from both the legislative intent and the general principle that exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the manifest reason and purpose of the law." Id. at 463-64. We endorse that approach.
The court went on to consider the dictionary definition of "damage" and the New Jersey Code of Criminal Justice definition of "property" offered by the prosecutor and found that those definitions, in a strictly literal sense, could support the prosecutor's argument. Id. at 464, 423 A.2d 695. However, the court recognized that the common meaning of the phrase should control, noting that "`[w]here a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter.'" Ibid. (quoting Blair, supra, 60 N.J. at 338, 288 A.2d 855). The court acknowledged as well that "`The matter of statutory construction here will not justly turn on literalisms.... [I]t will justly turn on the breadth of the objectives of the legislation and the commonsense [sic] of the situation.'" Ibid. (quoting Jersey City Chapter Property Owners Ass'n v. City Council, 55 N.J. 86, 100, 259 A.2d 698 (1985)). Ultimately, the court, based on common parlance, defined "physical violence or property damage" to mean "physical injury or tangible property damage resulting from the exertion of force." Ibid.
*494 The court further noted that the legislative intent and history, the Shield Law's purpose, design and spirit, and the breadth of objectives of the legislation all reflect an interest in establishing a broad shield for the news media. In light of these factors, the court found that the eyewitness exception must be strictly construed, id. at 465, 259 A.2d 698, and quashed the subpoena.

V
In many respects, the conflict presented here parallels that in Schuman between "the public's right to everyone's evidence and the public's right to the unencumbered free flow of information." 114 N.J. at 20, 552 A.2d 602 (footnote omitted). Our decision today emphasizes the protection of editorial judgment rather than the guarding of confidential sources. The distinction that could be made between disclosed and undisclosed sources or information does not shape our conclusions. See id. at 30, 552 A.2d 602. As we have recognized in the past, "every compelled production chills confidential sources." State v. Boiardo, 83 N.J. 350, 360, 416 A.2d 793 (1980).
The decision in Schuman that a newsperson's publication of privileged information did not constitute a waiver of the Shield Law privilege rests on the same conviction that compelled disclosure of any information chills the free flow of information from the press to the public. 114 N.J. at 30-31, 552 A.2d 602.
The perception created through the use of a newsperson as a prosecution witness causes some reporters and their sources to become apprehensive, regardless of whether the information sought is confidential. Moreover, it is equally burdensome for a newspaper to respond to or contest a subpoena when the testimony sought relates to non-confidential information. [Id. at 31, 552 A.2d 602.]
For all of those reasons, the rationale underlying our narrow construction of the eyewitness exception is similarly concerned with the protection of editorial judgment rather than the protection of confidential sources. We find that the fact of publication *495 of certain photographs is irrelevant to the decision not to compel their disclosure based on the plain language and judicial interpretations of Evidence Rule 27, which protects "[a]ny news or information obtained in the course of ... professional activities whether or not it is disseminated."
That this suit arises pursuant to a grand jury subpoena as opposed to a request for information in open court also does not delimit our determination of the proper circumstances for disclosure under the eyewitness exception. Although we noted in Schuman that a public trial will likely lead to more problematic disclosures than a grand jury situation in which the newsperson will not face cross-examination, 114 N.J. at 31-32, 552 A.2d 602, we do not find the difference in conditions sufficiently compelling to justify alternative standards for disclosure. As we reasoned in Boiardo I, "[a] legislature which so highly valued the free flow of information ... initially made the privilege absolute for the very reason that any disclosure [in camera or in open court] would destroy that flow. To interpret the procedural protections so as to distinguish [] the initial disclosure to the judge in camera from subsequent disclosures, potentially to the entire world, would be to disregard that judgment by the Legislature." 82 N.J. at 469, 414 A.2d 14 (footnote omitted). Similarly, to distinguish between grand jury proceedings and public trial in setting standards of disclosure would undermine the strong and undifferentiated protection set out for the press by the Legislature.
As stated previously, cases in other jurisdictions that invoke the eyewitness exception for a media employee are cases in which the employee witnessed human participation in a crime or accident. Supra, at 488, 589 A.2d at 138. Such cases understandably sustain the eyewitness exception. Nearly all of those cases begin their analysis with the seminal decision in Branzburg v. Hayes, supra, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, in which the Supreme Court refused to find a press privilege within the first amendment to quash good faith grand jury subpoenas of reporters. The Court focused on *496 balancing constitutional and societal interests in a free press and fair trials, id. at 709-10, 92 S.Ct. at 2670-71, 33 L.Ed.2d at 656 (Powell, J., concurring), and refused to create a special testimonial privilege for media personnel either regarding eyewitness observations or the source of information about a crime. Id. at 690, 92 S.Ct. at 2661, 33 L.Ed.2d at 644.
However, the Supreme Court also stated that state legislatures remained free to adopt press-privilege laws within first-amendment bounds. Id. at 706, 92 S.Ct. at 2669, 33 L.Ed.2d at 654. As of 1989, twenty-six states had adopted press shield laws, and ten others recognized a reporter's privilege as derived from common law or the state constitution. Liggett v. Superior Court (Gregerson), 224 Cal. App.3d 426, 433, 260 Cal. Rptr. 161, 165 (1989), superseded sub nom. Delaney v. Superior Court (Kopetman), 50 Cal.3d 785, 268 Cal. Rptr. 753, 789 P.2d 934 (1990).
In holding against reporters who claim immunity from testifying, many courts find that the rationale behind media privilege laws is to protect media access to confidential sources, and that in an eyewitness situation the reporter himself or herself is the source. Therefore, many courts reason, issues of confidentiality and chilling of the newsgathering process do not arise to block a reporter from testifying, a rationale we do not endorse. See e.g. In re Dan, 80 Misc.2d 399, 363 N.Y.S.2d 493 (1975), in which the New York Shield Law privilege was held inapplicable where a journalist personally observed alleged crimes material to a prosecution. The court rejected Mr. Dan's argument that he witnessed events at the Attica Correctional Facility in his capacity as a newsgatherer, and not as an arm of the government, finding that his observations of an uprising were material to the prosecution and not obtained "under a cloak of confidentiality." Id. at 401, 363 N.Y.S.2d at 496.
Similarly, in Liggett v. Superior Court (Gregerson), supra, 224 Cal. App.3d 426, 260 Cal. Rptr. 161, the court also found that its Shield Law did not protect unplanned observations of *497 public events, and upheld a subpoena in a civil action for film footage of an accident filmed by reporters. The court declined to extend to newspersons an absolute privilege covering all observations without regard to confidentiality. However, the California Supreme Court later disapproved that portion of the ruling that restricted Shield Law protections to only confidential information. Delaney v. Superior Court (Kopetman), supra, 50 Cal.3d 785, 804, 268 Cal. Rptr. 753, 764, 789 P.2d 934. Although the rationale underlying statutory construction of the eyewitness exception varies in some other jurisdictions, our decision today accords with the narrow construction of the term "act" in almost all decisions nationwide.

VI
In sum, the State's argument that an "act" includes the consequences thereof fails because it vitiates the currently strong Shield Law. If reporters sent to cover a fire were to lose their Shield Law protection because they have witnessed the consequences of an act involving property damage, there would remain no reasonable grounds on which press photographers would not be considered eyewitnesses as they arrive on the scene to gather news after a crime or accident has occurred. By emphasizing the meaning of "act" in the context of the law's purposes, we intend to provide trial courts with a basis for rationally distinguishing between a photographer who is an eyewitness and one who is not. Without some conceptual separation of the "act" from the "result," we would be hard pressed to identify a situation in which a reporter on any crime-related beat would not fall within the eyewitness exception and therefore be prevented from claiming Shield Law protection.
Our strong tradition of legislative and judicial decision-making over the past decade reflects a commitment to expanding the press freedoms. The broad interpretation of the eyewitness exception urged by the State contravenes that trend. If we *498 were to allow the State to obtain press photographs in cases such as this one, simply because its own photographs were unsatisfactory, there would be little to prevent the State from continually and increasingly calling on press resources in its investigations. If the Legislature intends for the press to play a supporting role in state investigations, contrary to its past indications, it must initiate such change itself.
Accordingly, we affirm the judgment of the Appellate Division.
For affirmance  Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN  7.
Opposed  none.